(May 18, 1900.)

## RICE v. RIGLEY—MOORE & GLIDDEN, INTERVENERS.

[61 Pac. 290.]

MINING CLAIMS—GRUB STAKE CONTRACT—RESULTING TRUST.—To establish a resulting trust in land, the evidence must be so clear and certain as to leave no well-founded doubt upon the subject.

EVIDENCE—WEIGHT OF—SPECIFIC PERFORMANCE.—In an ordinary equity suit, the allegations of the complaint may be established by a preponderance of the evidence, but to establish a trust in land, and to obtain a decree for specific performance, the contract sought to be enforced must be fully and clearly proved. A mere preponderance of evidence is not sufficient.

COMPETENCY OF WITNESSES.—Under the provisions of subdivision 3, section 5957 of the Revised Statutes, in an action against an administrator to establish a resulting trust in land, the plaintiff in such action is disqualified from being a witness as to matters of fact occurring before the death of such deceased person. *Nasholds v. McDonell*, 6 Idaho, 377, 55 Pac. 894, overruled on that point.

SECTION 5957 OF THE REVISED STATUTES CONSTRUED.—The term "claim or demand," as used in said section 5957, embraces all rights of action for the establishment of a. trust in land, as well as claims or demands for debts or damages against the estate of a deceased person.

(Syllabus by the court.)

APPEAL from District Court, Idaho County.

James E. Babb and W. N. Scales, for Appellants.

This being an action to hold defendants as trustees of an undivided one-half of the property for plaintiffs, by the specific enforcement of the alleged prospector's agreement, plaintiffs cannot have a decree upon a bare preponderance of the evidence, nor unless plaintiff's case is clearly and satisfactorily proven and all doubts are cleared up. (*Larkins v. Rhodes*, 5 Port. (Ala.) 207; *Lee v. Browder*, 51 Ala. 289; *Chambers v. Richardson*, 57 Ala. 87; *Lehman v. Lewis*, 62 Ala. 133; *Mobile Life Ins. Co. v. Randall*, 71 Ala. 221; *Bibb v. Hunter*, 79 Ala. 358; *Reynolds v. Caldwell*, 80 Ala. 235; *Crittenden v. Woodruff*, 11 Ark. 89; *Johnson v. Richardson*, 44 Ark. 370; *Crow v. Watkins*, 48 Ark. 174, 2 S. W. 659; *Millard v. Hathway*, 27 Cal. 120; *Woodside v. Hewel*, 109 Cal. 481, 42 Pac. 152; *Harvey v.*

*Pennypacker,* 4 Del. Ch. 460; *Lofton v. Sterrett,* 23 Fla. 574, 2 South. 837; *Mahoney v. Mahoney,* 65 Ill. 407; *Heneke v. Floring,* 114 Ill. 558, 2 N. E. 529; *McGinnis v. Jacobs,* 147 Ill. 31, 35 N. E. 214; *Jenison v. Graves,* 2 Blackf. (Ind.) 448; *Parmlee v. Sloan,* 37 Ind. 482; *Olive v. Dougherty,* 3 Iowa, 372; *McGregor v. Gardner,* 14 Iowa, 342; *Parker v. Pierce,* 16 Iowa, 231; *Sunderland v. Sunderland,* 19 Iowa, 329; *Childs v. Griswold,* 19 Iowa, 363; *Nelson v. Worrall,* 20 Iowa, 471; *Maple v. Nelson,* 31 Iowa, 327; *Shepard v. Pratt,* 32 Iowa, 298; *Trout v. Trout,* 44 Iowa, 474.) One of the parties to the transaction being dead the proof should be clear, unequivocal and without doubt and uncertainty. (*Snelling v. Utterback,* 1 Bibb (Ky.) 610, 4 Am. Dec. 661; *Hickey v. Young,* 1 J. J. Marsh. (Ky.) 3; *Carey v. Callan,* 6 B. Mon. (Ky.) 45; *Faringer v. Ramsay,* 4 Md. Ch. 37.) The rule in this state, as elsewhere, in such cases, is well established. (*Chambers v. Emory,* 13 Utah, 374, 45 Pac. 192.) Cases on specific performance: *Huddleson v. Briscoe,* 11 Ves. Jr. 591. The court is not to decree performance, unless it can collect upon a fair interpretation of the letters that they import a concluded agreement; that, if it rests reasonably doubtful, the court ought rather to leave the parties to law than specifically to perform what is doubtful as a contract. Quoted in *Stratford v. Bosworth,* 2 Ves. & B. 346; *Flood v. Finlay,* 2 Ball & B. 15; *Hartnett v. Yielding,* 2 Schoales & L. 554; *O'Rourke v. Percival,* 12 Rev. Rep. 71; *Bruse v. Lindsay,* 8 Vict. L. R. (Eq.) 235; *Grant v. Brown,* 13 Grant Ch. (Eq.) 257; *Rawlings v. Hislop,* 9 Vict. L. R. 27,) In an ordinary chancery case a complainant is required to establish the allegations of the bill by a preponderance of the evidence; but in a case of this character (specific performance), where the title of real estate is attempted to be taken from one and vested in another by a decree in a court of equity, something more than a bare preponderance of evidence should be required. (*Sands v. Sands,* 112 Ill. 232; *Green v. Dietrich,* 114 Ill. 644, 3 N. E. 800; *Clark v. Clark,* 122 Ill. 391, 13 N. E. 553; *Shaw v. Schoonover,* 130 Ill. 456, 22 N. E. 589; *Gould v. Elgin City Banking Co.,* 136 Ill. 67, 26 N. E. 497; *Koch v. National Union Bldg. Assn.,* 137 Ill. 499, 27 N. E. 530; *Wolfe v. Bradberry,*

140 Ill. 582, 30 N. E. 665; *Rock Island etc. Ry. Co. v. Dimick,*
144 Ill. 628, 32 N. E. 291.)    While evidence of declarations of
parties is admissible, it should always be cautiously received,
even while they are living, and in respect to agreements not re-
quired to be in writing.    It has less weight when the parties
are dead, and can neither contradict nor explain them, and
especially concerning a class of contracts that require un-
equivocal proof.    (*Missouri Pac. Ry. Co. v. McCarty,* 97 Mo.
222, 11 S. W. 52; *Poland v. O'Connor,* 1 Neb. 53, 93 Am. Dec.
327; *Lakerson v. Stillwell,* 13 N. J. Eq. 359; *Cooper v. Car-
lisle,* 17 N. J. Eq. 530.)    The parol agreement must be clearly
proved to the satisfaction of the court.    (*Brown v. Brown,* 33
N. J. Eq. 657; *Coles v. Browne,* 10 Paige (N. Y.), 526; *Lob-
dell v. Lobdell,* 36 N. Y. 330.)

V. Bierbower and Albert Allen, for Respondents, except In-
terveners.

This is a plain action for specific performance of an ordi-
nary prospector's grubstake agreement, made in the mountains,
and in the manner that such agreements are usually made, and
without the formality of a written agreement.    We insist that
in an action to compel the specific performance of such an agree-
ment no such rule as that contended for by appellants exists.
We think the rule is correctly stated in Pomeroy on Specific
Performance, sections 136, 137.    Counsel for appellants, in
their brief, commencing at page 101, contend that it was
error to admit the testimony of Rice and Mallory as to conversa-
tion with Robbins prior to his death.    They admit that the deci-
sion of this court in *Nasholds v. McDonell,* 6 Idaho, 377, 55
Pac. 894, as well as the decision of the supreme court of Cali-
fornia, in the case of *Myers v. Reinstein,* 67 Cal. 89, 7 Pac.
182, support the ruling of the court below in this case, but they
say the supreme courts of California, Utah and the United States
have held to the contrary before the decision of this court in
the case of *Nasholds v. McDonell.*    (*Booth v. Pendola,* 88 Cal.
36, 23 Pac. 200, 25 Pac. 1101; *Poulson v. Stanley,* 122 Cal. 655,
68 Am. St. Rep. 73, 55 Pac. 605.)    Upon the question as to
right to show all the circumstances surrounding Mallory and

under which he made the affidavit, we cite the court to the following cases; *People v. Wessel,* 98 Cal. 352, 33 Pac. 216; *Hawley v. Corey,* 9 Utah, 175, 33 Pac. 697; *Douglas v. Douglas,* 4 Idaho, 293, 38 Pac. 934, 935; *Kennelly v. Savage,* 18 Mont. 119, 44 Pac. 400, 401.

Stoll & McDonald, for Interveners Glidden, file no brief.

Reid & Worth, for Intervener John C. Moore, file no brief.

SULLIVAN, J.—This action was brought by the respondents Jacob N. Rice and Perry Mallory to enforce the specific performance of an alleged oral prospecting or grubstake contract, and to compel a conveyance to them of an undivided one-half interest in and to the Big Buffalo, Merrimac and Oro Fino mining claims, situated in Buffalo Hump or Robbins mining district, in Idaho county, which mining claims, it is alleged, were located by appellants and defendants B. R. Rigley and C. F. Robbins in pursuance of said alleged oral grubstake contract. After the commencement of the action, and before the trial, the defendant Robbins died, and one Dell Butterworth was appointed administrator of the estate of said deceased, and was substituted as a party defendant, and is an appellant here. The deceased, Robbins, during his lifetime, conveyed an interest in said mining claims to the defendant and appellant A. F. McKenna, and thereafter the defendants Dell Butterworth and Michael Green acquired an interest in said mining claims through said McKenna, and said defendants Butterworth and Mrs. Florence Young acquired interests to said mining claims through the defendant Rigley; and it is alleged that said interests so acquired by defendants Butterworth, McKenna, Green, and Young were acquired with full knowledge of the rights and claims of plaintiffs. The interveners (respondents) John C. Moore, Harry M. Glidden and Margaret P. Glidden claim an interest in said mining claims, the former through the plaintiff Mallory, and the Gliddens through the plaintiff Rice. The interveners are respondents on this appeal.

The allegations of the complaint, so far as material on this appeal, are: That the respondent Mallory had, before the location of said mining claims, acquired knowledge of the where-

abouts of the ledges of quartz on which said claims were located, and that such knowledge was of great value to one seeking to locate mining claims. That on or about the thirtieth day of July, 1898, the respondent Mallory informed his co-respondent Rice and appellant Rigley and said Robbins, now deceased, of said quartz ledges, and advised them that it would be (liable to be) a good enterprise to go and locate the same. That thereupon, on said thirtieth day of July, the respondents Mallory and Rice and defendants Rigley and Robbins entered into an agreement of copartnership for the purpose of locating said ledges or veins. That by the terms of said agreement it was mutually agreed that said Mallory was to furnish a description of the locality of said veins or lodes so as to enable Rigley and Robbins to find and locate them, and the respondent Rice was to furnish the supplies or grub necessary to sustain Rigley and Robbins while going to and locating said veins and returning therefrom, and tools with which to do the necessary work; and that said Rigley and Robbins, in consideration of said information furnished by Mallory, and of the supplies, tools and materials furnished by said Rice, agreed to proceed at once to the locality of said veins, and, if possible, to locate the same in the names of Mallory, Rice, Rigley and Robbins for their joint benefit, share and share alike. That in pursuance of said agreement of copartnership information and supplies were furnished, and said Rigley and Robbins located said mining claims, but located them in the names of said Rigley and Robbins only, and denied any right, title or interest of said Mallory and Rice therein. That thereafter Rigley and Robbins conveyed an undivided interest in said mining claims to McKenna, Butterworth and Young, as above stated. Said McKenna conveyed an interest therein to Butterworth and Green, and it is alleged that said conveyances were given and received with full knowledge of the alleged rights of Rice and Mallory in and to said mining claims, and that said grantees are made parties for that reason. The material allegations of the complaint were put in issue by the answer. The Gliddens filed a complaint in intervention, alleging that said Rice had entered into a contract with them for a transfer of a share of his alleged interest in and to said

mining claims, and prayed for an enforcement thereof. Rice and Mallory defaulted to said complaint in intervention. The appellants Rigley, Butterworth, McKenna, Green and Young answered, and put in issue the allegations of the complaint in intervention. J. C. Moore also filed a complaint in intervention setting up an alleged agreement with said Rice whereby said Rice agreed to transfer to the intervener Moore a certain share of the alleged interest of said Rice in and to said mining claims. Said Rice, Gliddens and the defendants (appellants) answered Moore's complaint in intervention, and put the material allegations thereof in issue. The action was tried by the court without a jury upon the issues made, and judgment and decree were entered in favor of the plaintiffs; also in favor of the interveners Mr. and Mrs. Glidden, and against the intervener Moore. The defendants moved for a new trial, which motion was denied, by the court. This appeal is from the judgment and order overruling the motion for a new trial.

This is an action for the specific enforcement of an alleged oral prospector's grubstake contract, and the following facts appear from the record: One J. E. Berryman had, about the year 1861, discovered a placer mine within twelve or fifteen miles, as he believed, of the mountain known and designated as "Buffalo Hump," in what is now Idaho county. That since his discovery of said placer mine he had made six or seven trips into the Buffalo Hump region for the purpose of again finding said placer mine. In the latter part of June, 1898, while on another trip to the Buffalo Hump region to find said lost placer mine, he met the respondent Mallory and three others, to wit, Percival, Strong and Cotter, at Craig's Mountain; and from near Denver, on Camas Prairie, they traveled together to Florence, and on to Meadow creek. Berryman stopped there in a cabin that he had erected in 1870 or 1871. Mallory and his party went on a few miles further, and camped, but returned to Berryman's camp in four or five days. Berryman was waiting for two men by the names of Montgomery and Fuller, who had promised to meet him there. While waiting for Montgomery and Fuller, Berryman and the others prospected there a little. Finally, on the third day of July, 1898, Montgomery and Fuller

arrived at Berryman's cabin, but were not ready to proceed on the intended trip in search of said lost placer mine. Berryman had told Mallory of the object of his trip in search of the lost placer mine, and Mallory expressed a desire to accompany him on said trip. Berryman informed him that he would be very glad to have him go, as in that region there was plenty of country and plenty of room. So, on the morning of July 5th, Berryman, Mallory and said Percival, Strong and Cotter started on the intended trip. Montgomery and Fuller, not then being ready to proceed, followed the Berryman party, and overtook them on that day. The party arrived at Wind river, which is about fifteen miles from the town of Florence, on the way to Buffalo Hump country, and did some prospecting there. Some, if not all, of the parties—Mallory among them—made partial locations of quartz claims there. Those partial locations were made on July 8th. The party broke camp at Wind river on the 9th of July, and on the 10th or 11th of July arrived at Buffalo Hump, and camped in the saddle of the Hump until the thirteenth day of July. In the meantime prospecting was done, and search for the lost placer mine was made. While camped at Buffalo Hump, they camped in the immediate vicinity of, if not on, the Big Buffalo ledge. That ledge was a very prominent one, and there were large quartz boulders all around their camp. No locations, however, were made on said ledge. On July 13th the party broke camp, and returned to Florence, and arrived there on the evening of the 14th of July, and camped near there, at Meadow creek. Berryman camped in the cabin above referred to, and Mallory and others near by. Berryman testified that while he was standing in the door of the old cabin the appellant Rigley drove up, and commenced to talk to him about the location of the country, and inquired if witness "knew of any place where there was likelihood of gold quartz mines," etc. Mr. Berryman informed him that the country in east of there was a likely country, and that he had been hunting a placer mine that he had seen many years before. Rigley camped there for the night, and in the evening Mr. Berryman described the Hump country to him, and told him about the placer claims he had once seen, and had just been hunting, and told him in

a general way what portion of the country he thought they could be found in, and also informed him of the quartz they had seen on their trip, and that he believed said placer claims were within ten or fifteen miles of the Hump, down the hill, south or southeast therefrom. Mallory was present, and took part in the conversation between Berryman and Rigley in the evening. This conversation lasted three or four hours, and was in regard to the trip Berryman had just returned from, and of the country he had seen. Mr. Berryman testified as follows: "Mr. Rigley was asking questions about quartz, and we were telling him about the quartz Mallory and I had seen on the trip." The next morning after that conversation Mr. Berryman started for his home in the state of Washington. It appears that Mallory had a conversation with Rigley about that large vein of quartz that they had seen at Buffalo Hump, and that, after they moved to Sand creek, he showed him some of the specimens. He further testified: "I had a number of conversations with him before we made the contract. I told him of those big ledges, and the number of ledges, and this one in particular"—the last-mentioned being the one on which said mining claims are located. After Berryman left them, Rigley, Mallory and a man by name of Cotter removed their camp to Sand creek. There they met the defendant Robbins and a man by the name of Mitchell. In a day or two thereafter Robbins and Mitchell moved their camp to Meadow creek, and Rigley and Mallory also went there to look for placer ground, and to see where Robbins and Mitchell were camped. Rigley and Mallory located a placer claim there, and took Robbins and Mitchell in said location. They then prospected that location until about the 20th of July. It did not prove to be of any value, and they abandoned it. Rigley and Cotter returned to their camp at Sand creek, and left Mallory with Mitchell and Robbins on Meadow creek. Mallory next saw Rigley on July 22d, when the latter was on his way to Grangeville. Rigley returned from Grangeville about July 27th. In the meantime he had sold a span of horses for $150, taking a check for $100 and a promissory note for fifty dollars. He thereafter got the check cashed. After his return he camped on Meadow creek, and, with Mallory, Robbins and Mitchell,

prospected a placer claim for a day or two, which they did not find profitable, and abandoned it. Mallory testified that they then broke up their partnership arrangements, and all started for Florence.

It appears that some conversation had been had between Rigley and Robbins in regard to going and looking for the placer ground that Berryman had told Rigley about. Mallory had talked to them about his going to Wind river, and doing the necessary work on the claims staked by him there, to complete the location thereof. They proceeded on their way to Florence, and camped near there on the 28th of July. Rigley testified that his intention was to go and look for placer ground, and, if he ran on anything else, he would stake it. On the twenty-ninth day of July, Rigley went into Florence, and purchased six dollars and twenty cents worth of provisions, and took them to his camp, with the intention of completing the bill the next day to be used by himself and Robbins on their intended prospecting trip to the Buffalo Hump country. On the morning of July 30th Rigley, Robbins and Mallory went to Florence. When they arrived there, Mallory received a letter from his wife, requesting him to come home. He showed the letter to Robbins and Rigley, and told them he would have to go home. As to what was said in that conversation Mallory and Rigley do not agree. Mallory testified that he told them he would like to do something with the two ledges that he had staked on Wind river, and the one he had seen at their camp in the saddle of the Hump, and, as he would have to go home, wanted to know what kind of an arrangement he could make with them to go over there and "look after those ledges." Rigley's testimony is to the effect that Mallory wanted to know what arrangement he could make with them to do the necessary location work on the Wind river claims, as he had to go home. They told him they would do the work for him, and that, if he made anything out of the claims, and wanted to give them anything, all right; and, if they did not make anything out of them, it was all right any way. Rigley then requested Robbins to complete the grub bill, and that he did so by adding to what Rigley had purchased the day before. After the bill was completed, and the amount

of the bill ascertained, Rigley was about to take the amount out of his pocket, to hand to Robbins, to make the purchase, when Mallory said: "No, no; not much; you don't do that. I have given Jake Rice a quarter interest in these two claims to pay for grub and tools, and, if you boys do the work, that is enough. He gets a quarter interest for the grub and tools, and you do the work, and that is all I ask of you." Mallory thereafter went to see Rice, and returned, and said it was all right; and a son of Mr. Rice purchased provisions amounting in value to nine dollars and twenty cents. Rigley testified as follows: "During these conversations when getting this grub ready to start out there to do the work on Mallory's claims on Wind river, nothing at all was said by any person about our going on to do any work under any arrangement with Rice or Mallory in the way of locating claims at Buffalo Hump." All of the direct evidence contained in the record in regard to the terms of said contract is from Mallory and Rigley. Mallory testified that the grub was furnished for the purpose of completing the locations on Wind river and the location of the ledge at the Hump, while that of Rigley is to the effect that it was furnished as the consideration for the work to be done, and which was thereafter done by Rigley and Robbins on the Wind river claims. Mallory accompanied Rigley and Robbins to the Wind river claims, and remained with them one day, and thereafter Rigley and Robbins did the required work on said claims, and delivered the location notices to the son of Mr. Rice. They did not claim any interest in said locations for doing the work. Rice had no conversation with Rigley or Robbins in regard to said agreement or arrangement. The evidence on the part of Mr. Rigley shows that Mallory was intending to go to Wind river, and complete the location of some quartz claims there; that when they went into Florence on the morning of the thirtieth day of July, and up to the time he received the letter from his wife, that was his expressed intention, and it was also the intention and purpose of Rigley and Robbins to go prospecting into the Buffalo Hump country, ostensibly for the purpose of searching for the placer ground of which Berryman had told them, and for anything they might

find; that Mallory was quite anxious to complete said locations by doing the one hundred and sixty cubic feet of work thereon required by law. From the testimony of Mallory it is evident that up to the time of the receipt of the letter from his wife no grubstake contract had been suggested or entered into. Mallory accompanied Robbins and Rigley to the Wind river claims, and remained there one day, and after he left for home Robbins and Rigley did the work on the Wind river claims, and delivered the location notices to a son of Mr. Rice. They did not locate themselves in said claims, or claim any interest therein for doing said work. The record shows that when the Berryman party, of which Mallory was one, discovered any ledge on said trip that they thought of sufficient value, they located it, as on Wind river. They camped on or very near the Big Buffalo ledge for two or three days, with large quartz boulders all around their camp, and evidently neither of them thought said ledge worth locating. The record shows that Mallory did not consider said ledge of any value. R. J. McLean, apparently a disinterested witness, testified that he called Mallory's attention to the ledge on which the mines in dispute were subsequently located, and had a talk with Mallory about it. He testified: "I had some talk with Mr. Mallory about it [said ledge]. He came to our camp one night, and I says, 'There is a big ledge down there, if you want to locate it—a quartz ledge.' He said that it was 'bull quartz,' and there wouldn't be a dollar in one hundred and sixty acres of it." If that conversation did occur, it would show Mallory's opinion of said ledge, and would rebut the idea running through Mallory's testimony that he was constantly talking about said ledge. His testimony shows that he took a piece of quartz from said ledge, and carried it to Florence with him, but that he did not think enough of it to have it assayed or tested, and did not show it to Rigley until they moved to Sand creek, if at all. The evidence shows that up to the thirtieth day of July, he was much more anxious about the claims that he had discovered on Wind river than about the big ledge at the Hump. He was going to complete those locations, and went to Florence on the 30th of July for the purpose of getting grub to sustain him while doing the necessary work

thereon. Robbins and Rigley went to Florence on that day to complete the purchase of a bill of grub (a part of which they had purchased the day before) that they contemplated taking with them for use on a prospecting trip to the Buffalo Hump to search for Berryman's lost placer mine, and whatever else they might find. Mallory, on his arrival in Florence, received a letter from his wife, requesting him to come home. The record fails to show, up to that time, that there was any intention on the part of Robbins and Rigley to go prospecting with Mallory on his and their joint account. It appears that Robbins, Mallory, Rigley and one Mitchell together had been prospecting some placer ground just prior to July 28, 1898, and Mallory testified that they prospected a little the morning of the 28th, "and that they then broke up their partnership arrangements, and all started for Florence that evening." The trial court found that Mallory remained with Rigley and Robbins while they did said work, but the testimony of both Mallory and Rigley is to the effect that he remained there one day, and that they did a little prospecting, and the next day he left for home, and after that Rigley and Robbins did the location work on said claims. As to the terms and conditions of said contract, there is a direct conflict in the testimony of Mallory and Rigley, they being the only persons present when the contract was made, except Robbins, now deceased. There is some evidence in the record that tends to corroborate Mallory and some other that tends to corroborate Rigley. The affidavit made by Mallory in which he swears that Rice had no interest in the alleged grubstake contract, his statements to numerous witnesses to the same effect, and other matters revealed by the record indicate that the utmost confidence cannot safely be placed in his veracity and truthfulness. The evidence, viewed as a whole, indicates that both respondents and appellants have done things and acts that look suspicious, and which show that they have shuffled to gain a point or avoid a responsibility in this matter. But, to give the most favorable view possible to all of the evidence for the respondents, the terms of the alleged contract are left in doubt and uncertainty, and for that reason specific performance cannot be decreed. Therefore the first error as-

signed by the appellants, which goes to the sufficiency of the evidence to support the facts found by the court, must be sustained.

As to the law of the case, counsel for appellants contend that, as respondents are seeking to hold the appellants as trustees of an undivided one-half of said mining claims, and to enforce the specific performance of an alleged prospector's or grubstake contract, respondents cannot have a decree upon a bare preponderance of the evidence, and that they are not entitled to a decree unless their case has been clearly and satisfactorily proven, and all doubts cleared up; while counsel for respondents contend that in this class of cases the rule is well established that a mere preponderance of the evidence is all that is required. The trial court held that a preponderance of evidence was all that was necessary to establish plaintiffs' case. Counsel for appellants cite and quote from a large number of authorities in support of their contention. Counsel for respondents contend that nearly every case cited by appellants was an action to reform a written deed or instrument, or to have a trust declared contrary to the specific terms of a written instrument, and are not applicable to the case at bar. Counsel, however, concede that the cases of *Proudfoot v. Wightman,* 78 Ill. 556, and *Dewey v. Land Co.,* 98 Wis. 83, 73 N. W. 566, require explanation, and those cases are explained by counsel by suggesting that the decisions in those cases are "simply the opinion of the court as to what the rule ought to be." We think, however, the correct rule is stated in those cases. After a most thorough examination of this question, and of the authorities cited, we conclude that the rule is well settled in a case like the one at bar that something more than a bare preponderance of the evidence is required to entitle the plaintiff to a decree declaring a resulting trust and for specific performance. In the first case above cited the court says: "In an ordinary chancery case a complainant is required to establish the allegations of the bill by a preponderance of the evidence, but in a case of this character . . . . something more than a bare preponderance should be required." In *Dewey v. Land Co., supra,* (which was a case to enforce specific performance of an oral agree-

ment to convey land), it is said: "Specific performance is not a matter of strict right, but rests in the sound discretion of the court, and the contract sought to be enforced must be fully and clearly proved in all its parts. A mere preponderance of evidence is not sufficient." It is held in *Printup v. Mitchell,* 17 Ga. 567, that a parol contract for land, like the reformation of a deed by parol proof, should be made out so clearly, strongly, and satisfactorily as to leave no reasonable doubt as to the agreement. In *Johnson v. Quarles,* 46 Mo. 423, the plaintiff attempted to establish a resulting trust in land, and the court used the following language as to the evidence introduced, to wit: "While admitting such evidence for the purpose of creating this resulting trust, the chancellor has always required that it be clear and unequivocal." "The insecurity of titles, and the temptation to perjury, among the chief reasons demanding that contracts affecting lands should be made in writing, also imperatively require that trusts arising by operation of law should not be declared upon any doubtful evidence, or ever upon a mere preponderance of evidence. There should be no room for a reasonable doubt as to the facts relied upon." (See, also, *Ringo v. Richardson,* 53 Mo. 385; *Barbour v. Barbour,* 51 N. J. Eq. 271, 29 Atl. 148; *Association v. Brewster,* 51 Tex. 263; 2 Pomeroy's Equity Jurisprudence, sec. 1040.) As to the evidence necessary to establish a resulting trust in land, the court, in *Reynolds v. Caldwell,* 80 Ala. 232, said: "The rule is that a trust of this nature, sought to be ingrafted upon lands by parol evidence, and such as result by operation of law must be supported by testimony not only entirely satisfactory, but clear and undoubted." In the case at bar plaintiffs are attempting to ingraft a resulting trust by oral evidence upon mining ground, the title to which, as against every one except the government of the United States, is admitted to be in the defendants, who are appellants here; and to contend that the rule herein laid down only applies to written instruments, and does not apply to titles to mining land acquired by location under the laws of the state and the United States, is attempting to point out a distinction in a matter where in fact no difference exists. The appellants' title rests on discovery and proper lo-

cation, filing for record a proper notice of location, and complying with the law therein. The title results from a compliance with the law. The title is in appellants. Respondents seek to ingraft thereon a resulting trust, whereby they may be decreed to be the owners of an undivided half interest of, in, and to said three mining claims, and pray a specific performance of an alleged "grubstake and information contract," for the alleged contract sued on is not alone a "grubstake contract." As applied to respondent Rice, it is, but, as applied to Mallory, it is not, for it is alleged in the complaint that Mallory furnished "information" as his part of the consideration for said contract, and Rice furnished "grub" for his. If there is any authority that holds that a greater weight of evidence is necessary to ingraft a resulting trust on land acquired by location than on land acquired by deed, we have been unable to find it, and counsel for respondents have not called our attention to it. In either case the evidence must be satisfactory, clear, and convincing. It must be so clear and certain as to leave no well-founded doubt in the mind of the court. The evidence of the respondents, when tested by that rule, will not entitle them to a decree. The admission of the testimony of Mallory and Rice as to the conversation with Robbins at the time of making said alleged contract and prior to his death is assigned as error. Counsel for appellants contend, under the provisions of subdivision 3, section 5957 of the Revised Statutes, that Mallory and Rice were not competent witnesses to testify to any matter of fact occurring before the death of said Robbins. Said section, *inter alia,* provides as follows: "The following persons cannot be witnesses: . . . . (3) Parties or assignors of parties to an action or proceeding or persons in whose behalf an action or proceeding is prosecuted, against an executor or an administrator, upon a claim or demand against the estate of a deceased person, as to any matter of fact occurring before the death of such deceased person." Counsel for appellants contend that this suit is founded on a claim or demand against the estate of Robbins, deceased, while counsel for respondents contend that it is not, but that it is an action to enforce a trust against the estate of said deceased,

and is not a claim or demand against said estate. Section 1880 of the Code of Civil Procedure of California is the same as section 5957 of the Revised Statutes, above cited, and under the provisions of said section the supreme court of California has held in *Meyers v. Reinstein,* 67 Cal. 89, 7 Pac. 192, that an action to establish and enforce a trust against the estate of a deceased person is not a "claim or demand" against such estate. *Tyler v. Mayre,* 95 Cal. 160, 27 Pac. 160, sustains *Myers v. Reinstein.* But on rehearing (95 Cal. 163, 30 Pac. 197), the opinion consists of but eight lines, and states that the court is satisfied with the conclusion reached in 95 Cal. 160, 27 Pac. 160, but in the syllabus it is stated that *Tyler v. Mayre,* 95 Cal. 160, 27 Pac. 160, is overruled. In *Moore v. Schofield,* 95 Cal. 486, 31 Pac. 532; which was an action to enforce a trust, the supreme court apparently discredited the rule laid down in *Myers v. Reinstein, supra.* The court said, "It would, indeed, seem to be a claim or demand against the estate." However, in *Poulson v. Stanley,* 122 Cal. 655, 68 Am. St. Rep. 73, 55 Pac. 605, the case of *Myers v. Reinstein* is cited with approval. In that case the court says: "In *Myers v. Reinstein,* 67 Cal. 89, 7 Pac. 192, it was held that this provison of the statute did not render the plaintiff incompetent in an action to establish a resulting trust in certain property held by an estate. The court therefore did not err in permitting the witness to give testimony." In that case *Moore v. Schofield, supra,* is not referred to. If the supreme court of California intended in *Moore v. Schofield* to discredit *Myers v. Reinstein,* it evidently removes that discredit in *Poulson v. Stanley, supra.* The supreme court of Utah, in *Wood v. Fox* and *Whitney v. Fox,* 8 Utah, 380, 32 Pac. 49 under a statute the same as the above cited, held that an action to establish a resulting trust against the estate of a deceased person was a "claim or demand" against such estate—which case was carried to the supreme court of the United States, and is reported in 166 U. S. 637, 17 Sup. Rep. 713, 41 L. ed. 1145. In that case the plaintiff sought a decree declaring him to be the equitable owner of one-eighth of the Mansion House, situated in Detroit, Michigan, and entitled to rents, issues, and

profits thereof, as well as a part of three thousand shares of mining stock and dividends thereon. The supreme court of the United States said, speaking through Justice Harlan: "We cannot doubt that the claims as asserted in this suit by Whitney are, within the meaning of the Utah statute, claims or demands against the estate of a deceased person. . . . . The supreme court of Utah properly rejected the suggestion that such claim or demand was not against the estate of Lawrence. To say that the only issue here was whether the real property and stock described in the petition constituted a part of Lawrence's estate, and that no claim or demand was asserted against the estate, would be to defeat what, it seems to us, was the manifest object of the statute. While, as said by this court in *Coulam v. Doull,* 133 U. S. 216, 10 Sup. Ct. Rep. 253, 33 L. ed. 596, it is the ordinary rule to accept the interpretation given to a statute by the courts of the country by which it was originally adopted, the rule is not an absolute one, to be followed under all circumstances. We concur in the interpretation placed upon the Utah statute by the supreme court of Utah as one required by the obvious meaning of its provisions, and we do not feel obliged by the above rule to reject that interpretation because apparently the highest court of the state from which the statute was taken has in a single decision taken a different view." In that decision the supreme court of the United States declares that the interpretation placed upon said statute by the supreme court of Utah is the one required by the obvious meaning of its provisions, and refuses to follow the narrow, restricted, and technical construction placed upon said section by the supreme court of California. In *Myers v. Reinstein* the decision proceeds upon the theory that the letter of the statute must control, and leaves out of sight that beneficent rule laid down in the statutes of California— the rule of the common law that statutes in derogation thereof are to be strictly construed—which it is held has no application to the statutes of that state, and that their provisions and all proceedings under them, are to be liberally construed with a view to effect their objects and promote justice. And to hold, under the provisions of said section 5957 of the Re-

vised Statutes, that this action is not a claim or demand against the estate of said Robbins, deceased, and permit respondents to testify as to a contract alleged to have been made with deceased during his lifetime, would defeat the manifest object and purpose of said statute. Under the law the legal title to an undivided interest in said mining claims was in the deceased at the time of his death, and was a part of his estate; and the respondents now claim to be the equitable owners of an interest therein by reason of said alleged oral contract. Robbins, being dead, cannot testify as to the alleged contract, and said statute is intended to and does disqualify the respondents Rice and Mallory as witnesses to said contract. In the case of *Nasholds v. McDonell,* 6 Idaho, 377, 55 Pac. 894, this court held that the provisions of said section 5957 did not apply to an action brought to establish a trust against the estate of a deceased person. On that point the only case cited in briefs of counsel was the case of *Myers v. Reinstein, supra,* and, as that point was not seriously controverted by the counsel for appellant, this court considered that case decisive on that point under the ordinary rule to accept the interpretation given to a statute by the courts of the state from which it was adopted. But upon a careful examination of that question we find that said statute became a law in this then territory, June 1, 1875—long before the decision of the case of *Myers v. Reinstein,* and some months prior to the decision in *Blood v. Fairbanks,* 50 Cal. 420. Hence, the California decisions do not come within the rule above stated, and are only precedents, and have no more binding force upon this court than the decisions of the supreme court of Utah and that of the supreme court of the United States, both of which are in accord with the spirit and intent of the provisions of said statute. In *Moore v. Schofield,* 95 Cal. 486, 31 Pac. 532, the supreme court of California said that the decisions under said statute were upon the principle that "the letter of the statute must control." Under our system the spirit must control, and the statutes must be liberally construed with a view to effect their objects and promote justice. The object of said statute was to prevent the decimation and

confiscation of a deceased person's estate upon the testimony of parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator upon a claim or demand against the estate of a deceased person as to matters of fact occurring before the death of such person; and to hold that a claim for a resulting trust does not come within the intent of said statute would be to give that term a narrow and restricted meaning, much narrower than was given to it by Lord Coke and other eminent jurists since his time. Lord Coke said that the word "demand" is the largest word known to the law, save only the word "claim," and "a release of all demands discharges all rights of action." (*Gray v. Palmer,* 9 Cal. 636.) Chief Justice Nelson said in *Re Denny and President, etc., of Manhattan Co.,* 2 Hill, 223: "The term 'demand' is of much broader import than 'debt,' and would embrace rights of action belonging to the debtor, beyond those which could appropriately be called debts." Applying to the words "claim or demand," as used in said section, the definition or meaning of said term as given to them by Lord Coke and Chief Justice Nelson, and the plaintiffs in this case have no right of action if they have no claim or demand against the estate of the deceased, for "claim" embraces rights of action, and, as said by Lord Coke, a release of all demands discharges all rights of action. Therefore, if plaintiffs had no claim or demand against the estate of said deceased, they cannot evade the intent and purpose of said statute by attempting to ingraft a trust thereon whereby they can secure a large share of said mining claims, the legal title to which is in the name of said deceased.

The court erred in permitting said Mallory and Rice to testify in regard to conversations that they had with said Robbins, deceased, and that part of the opinion in *Nasholds v. McDonell, supra,* which holds that the provisions of said subdivision 3, section 5957, does not apply to an action brought to establish a trust is hereby overruled. However, in that ca there was competent testimony to establish the trust a As the record shows that no one was present at the

Points decided.

alleged ˙contract was made except appellant Rigley and Rob-ˡ bins now deceased, and Mallory, and that the plaintiffs have produced all of the evidence that they could produce in support of the allegations of their complaint, we conclude that no benefit can result to the respondents by a retrial of the case, and therefore reverse ᵗhe judgment and decree of the court below, and remand the case, with instructions to the trial court to enter judgment in favor of the appellants and against the respondents in accordance with the views expressed herein, dismissing ⁱsaid action. Costs of this appeal are awarded to the appellants.

Huston, C. J., concurs.

Quarles, J., did not sit at the hearing of this case, and took no part in the decision thereof.