(No. 5316.   July 6, 1929.)

SARAH E. WALKER, Widow, A. T. DISHMAN and ANNIE B. DISHMAN, Husband and Wife, Appellants, v. WILLIAM CRAWFORD JACKSON, ABBIE S. ANDERSON, VESTA FREEMAN, CARLTON JACKSON, and GRACE E. WATSON et al., Respondents.

[279 Pac. 293.]

J. Ward Arney, for Appellants.

J. E. Gyde, for Respondent Mather, Admx.

Franklin Pfirman, for Respondent Deer Creek Mining Co., files no brief.

VARIAN, J.—Plaintiffs bring this action upon a grub-stake contract to establish in them a two-thirds interest in the Ruth, Emerson and Essex lode mining claims situate in Beaver Mining District, Shoshone county, Idaho, claiming the right to possession thereof, subject to a lease of said mining claims to the defendant Deer Creek Mining Company. The amended complaint alleges that the plaintiffs' interests are derived from the location of said mining claims in the name of Darius W. Jackson, now deceased, who located and perfected said claims under the express written and verbal agreement that they were to belong jointly to decedent and plaintiffs, decedent to own one-third, plaintiff Sarah E. Walker one-third and plaintiff A. T. Dishman one-third; that from on or about the year 1921, decedent Jackson and plaintiffs were operating under a written agreement by the terms of which Jackson was to locate and hold said three mining claims in the name of decedent Jackson in the ownership as aforesaid, the plaintiffs to furnish Jackson with the necessary supplies and moneys to locate and perfect title to said mining claims, and Jackson to perform the location work and perfect the title to said claims and hold the same in his own name to expedite the handling, transfer and

sale of said mining claims on behalf of said decedent and plaintiffs; that all of the parties to said agreement performed the same according to the terms thereof. Plaintiffs rely upon oral statements and upon letters written by deceased, to establish the contract. The court found against the plaintiffs, and that there was no contract; that there had been no furnishing of supplies as plead; and, in effect, that plaintiffs were guilty of laches in the prosecution of the present suit.

Mrs. Bishop, a daughter of Mrs. Walker, testified that she was present at a conversation at her mother's home in Spokane early in 1922 (couldn't remember the date) at which plaintiffs Dishman, Walker and Mr. Trunk, her brother, and decedent Jackson were also present; that the talk was between Mrs. Walker, Dishman and Jackson. "They" asked deceased to locate the claims to be named the Ruth, Emerson and Essex, the interest to be equal between Mrs. Walker, Dishman and Jackson. "They" (presumably Mrs. Walker and Dishman) were to send Jackson food and grubstake him. The claims were to be "taken" in Jackson's name so that he might handle the property in case of a sale. She further testified that Mrs. Walker sent Jackson clothes, foodstuffs and medicine, both before and after the said conference. Mrs. Walker's son, Trunk, testified to the same parties being present at Mrs. Walker's home at Spokane some time in June, 1921–22; that the Banner-Belmont had been in the family about fifty years and had "gone broke"; that they wanted to relocate these claims, which was the object of the meeting; each was to be equally interested in them, and Mrs. Walker and Dishman were to finance Jackson in the expenses of location, and paid his carfare and location expenses to come to Spokane. Mrs. Bishop also testified that at the time of the conference Dishman gave Jackson twelve or fifteen dollars.

Plaintiffs rely upon six letters, in Jackson's handwriting, one of which does not bear his signature, and all sent from Murray, Idaho, addressed to plaintiff Mrs. Walker at Spokane. Another letter written from the hospital at

Wallace is also in evidence. It is difficult to give the substance of these letters, and therefore they are copied *in haec verba*, omitting signature and name of addressee and address in each instance. The date of each letter is made to appear.

(August 3, 1922.) "I am surprised that Mr. Monroe came back so soon. I wonder what was the matter. The exposition is just getting started now. Round trip ticket $450 from New York. He seems to be out of luck.

"There is no hurry about the you know. Have three months to file and the least said about it now the better. No one here knows a thing about it—only one man who does not talk and I could trust for witness. Mr. Dishman seems to have bad luck or is it to get the insurance? Now, he said he was coming up this month. He is out not one cent only stock in trade. He did not pay in assessment, Poole says. There is plenty of stock in the treasury if he wanted to go ahead. He is no miner. If he comes you had better have Dick Williams come with him. You can't come so send Dick. We want to avoid law suits. Some unscrupulous person."

(August 7, 1922.) "Please let me know when, or, if Mr. Dishman is coming up soon. The sooner the better. Time is money."

(August 8, 1922.) "Your letter at hand. Mr. Dishman tole me before you he would be up here in August. Now is he coming? And let me know soon. The property is wholly in my name and I can handle it or have a show to. What do you consider your stock worth say with Mr. Dishman's. Let me know. Wake up now."

(August 11, 1922.) "I ans. your letter but since then a man come to wheare I was working wanting sometime to look at the location.

"The property is in bad shape, the tunnel wheare Wolfle done all their work is caved so nobody can get in to see, the up raise is caved full.. I think it was done intentionally, so there is nothing to show anybody. This man wants 90 days and has agreed to get to work and clear fix the road providing its not to high the price. Now you fix yours &

Dishman, set as low a value as you can. It means work on the property. It is worthless as it is now. I located 3 claims one called the Ruth, the Emmerson & the Essex and it was hard work and hot. Mr. Wolfle men never put up a stake. Tried to cut lines thru thick brush and trees. Mr. Dishman need not come unless he wants to. It needs lots of cash to start up. And I am tired of it. It would have been lost but for me. People have been running up there before and since I quit going. Now I have given this man 90 days time to see if he can raise the money to start up so let me know how much you settle with Mr. Dishman. I am doing the business, claims are recorded. Was in Wallace after 2:00 P. M. and done the business.''

(August 16, 1922.) ''I received your two letters. I located the claims in my name, as proposed. I am doing this business without hinderance from anyone. You have no need to come. Now, Dishman, he never gave me his address. All the old company are dead and I am the new boss.

''This man is to start work the 1st of September continuous. I will give you further details if he comes through. Now please wait—you can let me know what you want on your part. I am very busy with my own work. Can bond if in shape.''

(November 10, 1922.) ''I received the box of nice cookies and doughnots. Thanks.

''Mr. P. T. Scoles was here on election day. He told me there had been some knocking of the mine at Spokane and Wallace. And his partner backed down on that account. They told him that there was only three inches of ore in the bottom of the shaft and the vein had pinched out. The Wallace papers said Wolfle's brother was up here but they are all around here knockers and trying to knock this deal. This is the only mining deal here this summer. They have been working since September the 1st and are still working and go there in an auto now. Cleared the tunnel and fixed up the building. Three men part of the time. Cash is hard to raise just now till things get more settled. He with my

consent will place the securities on interest for the money at the National Bank today. Then it will be twelve months to the next payment. And show the knockers what work can do. He got blood poison in the right hand and arm swollen. Had to have it cut three times, now has a boil on his left arm. The water is bad there. I did not tell him so. The work will go on.'' (Unsigned.)

(March 26, 1923.) ''I have been in the hospital 10 or 11 days with a bad foot and my right foot has swollen in the last three days. I am in hopes to get out all right. Thanks for tomatoes. Will make all right when I get out of here. Left foot is very sore and bandaged all the time. Kind regards to all.''

Respondents move to dismiss the appeal upon the ground that all of the adverse parties have not been served with notice of appeal as required by the provisions of C. S., sec. 7153. Defendants Peter Bernier and Peter J. Scoles were served with process, defaulted and were not served with notice of appeal. The amended complaint alleges that said defendants and the Deer Creek Mining Company have entered into a contract to purchase the mining claims in controversy, with the administratrix of the estate of Darius W. Jackson, deceased, and that confirmation thereof had been ordered by the probate court. It is apparent that no attack is made in this proceeding upon the transaction had by the administratrix with Bernier and Scoles, counsel stating at the trial in effect that plaintiffs claim two-thirds of the proceeds thereof, or, in case the contract is not fulfilled, a like interest in the three mining claims. We do not deem them adverse parties within the purview of the statute cited. Again, William Crawford Jackson, Abbie S. Anderson, Vesta Freeman, Carlton Jackson and Grace E. Watson, designated in the amended complaint as ''sole distributees'' of said estate, are named as defendants in this action. On oral argument, it was admitted that they were never served with process, and the record fails to show that they were ever so served, or appeared, or were brought into the trial court. They were not served with notice of appeal. Not

being parties to the action, they cannot be affected by the proceedings, or by any reversal or modification of the judgment entered herein, and are not "adverse parties." (*Frost v. Alturas Water Co.*, 11 Ida. 294, 81 Pac. 996.) The motion to dismiss the appeal is denied.

This court has twice at least passed upon the *quantum* of proof necessary to establish a parol grubstake contract. In the earlier case of *Rice v. Rigley*, 7 Ida. 115, 61 Pac. 290, the rule was laid down that in order to ingraft a resulting trust on land acquired by mining location, the proof of an oral grubstake contract "must be so clear and certain as to leave no well-founded doubt in the mind of the court." In short, it approved the rule that such a contract must be proven to a moral certainty and beyond a reasonable doubt. In the later case of *Morrow v. Matthew*, 10 Ida. 423, 79 Pac. 196, after concluding that that case presented different facts from those presented in *Rice v. Rigley*, this court held that grubstake contracts, whether in writing or parol, will be enforced where it is shown that the contract was entered into, and the terms and conditions thereof, saying:

"It is also true that the courts have quite generally held that in order to enforce the specific performance of a parol contract it must be *clearly* and *satisfactorily* shown to the trial court as to its execution and the terms and conditions thereof. If the contract has not been reduced to writing it must of necessity require a greater weight of evidence to establish its existence, and the terms and conditions thereof, and in those respects satisfy the mind of the court, than if the contract were in writing and produced in evidence."

It has been held that where the alleged trustee is dead, especially after long lapse of time, a higher degree of proof should be required to establish an oral contract setting aside apparently absolute titles to land. (See exhaustive note, 23 A. L. R. 1528 et seq.; *Appeal of Wilson*, 84 Conn. 560, 80· Atl. 718; *Crissman v. Crissman*, 23 Mich. 217; *Henninger v. McGuire*, 146 Iowa, 270, 125 N. W. 180; *Robson v. Moore*

(Tex. Civ. App.), 166 S. W. 908; *Stevens v. Fitzpatrick*, 218 Mo. 708, 118 S. W. 51.)

The testimony of the son and daughter of Mrs. Walker as to the oral contract falls short of being clear and satisfactory. Neither testified as to what was said by any of the parties. Their evidence amounts to their conclusion that Jackson was to locate the three mining claims in his own name, and that Dishman and Mrs. Walker were each to have a one-third interest therein, and they were to pay Jackson the location expenses, as testified to by Trunk, or send him food and grubstake him and back him up in what he did, according to Mrs. Bishop. These are the only witnesses as to the oral contract, and both are uncertain as to dates and details. The letters written by Jackson do not in themselves constitute a contract, nor do they in terms refer to the alleged oral grubstake contract, nor to the terms and conditions of any contract shown by the evidence. The allusions to Dishman, sums of money and the names and location of the mining claims in controversy do not necessarily point to a contract like that sought to be established here. It might be as consistently inferred from these letters that Jackson was, and claimed to be, the sole owner of all the mining claims located by him and was seeking to bond or sell them to Dishman or others. At most the letters, unexplained, indicate a natural desire on Jackson's part to develop or dispose of his claims, and are not corroborative of the oral testimony. These letters, by reason of Jackson's demise, are incapable of explanation now. Were he living, he might have some explanation whereby it would clearly appear that the references contained in them were meant to apply to other and different matters, even to another and different contract between the same parties.

Defendants plead laches and the trial court found facts, supported by the record, from which laches on the part of appellants in prosecuting their claim may be inferred. Jackson located the Ruth, Emerson and Essex mining claims on July 1, 1922, recording the notices thereof on August 2, 1922. He died on April 2, 1923, plaintiffs receiv-

ing prompt notice of his death. The record shows some communication between different counsel representing the plaintiffs and counsel for the administratrix, in which matters pertaining to the Jackson estate were mentioned. No formal claim against the estate was made until demand served on the administratrix January 25, 1927, more than four years after location of the claims and notice thereof to Mrs. Walker, and nearly four years after the death of Jackson.

In the meantime, the administratrix, with the formal sanction of the probate court, executed a bond and lease for the sale of said mining claims to defendant Deer Creek Mining Company, received the initial payment thereunder, and by authority of the probate court distributed a portion of the sum so received to Jackson's heirs. The amount so distributed is much less than a third of the purchase price fixed by the agreement with the mining company, and therefore if plaintiffs should prevail in this court, the administratrix has not distributed all the moneys coming to the estate (under plaintiffs' theory of the case), provided the mining company completes its payments and pays the full $20,000 purchase price. Apparently, plaintiffs held back before commencing this suit until a substantial payment was about due under said agreement, and made no offer to contribute to the annual assessment necessary to hold said claims under the law. Nor can we see how they were excused by reason of the fact that it was in the mining company's contract that it should do so. Plaintiffs were not parties to that contract.

The present action was commenced on September 20, 1927, more than five years after the location and record of the mining claims, and more than four years after Jackson's decease.

██ The defense of laches, in equity, even in those code states where there is but one form of action, may be invoked irrespective of the running of the statute of limitations. That the statute has or has not run will not prevent the application of the doctrine, which must be determined

by the circumstances of each particular case. Lapse of time is one of the chief ingredients of laches, "but there are others of almost equal importance. Change in the value of the property between the time the cause of action arose and the time the bill was filed, complainant's knowledge or ignorance of the facts constituting the cause of action, as well as his diligence in availing himself of the means of knowledge within his control,—are all material to be considered upon the question whether the suit was brought without unreasonable delay."

And again: "There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which today may have no salable value may in a month become worth its millions. . . . . Persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced." (*Patterson v. Hewitt*, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. ed. 214.)

And for a comprehensive review of the authorities, see the same case as reported in 11 N. M. 1, 66 Pac. 552, 55 L. R. A. 658.

Apparently the trial judge did not base his decision in the instant case entirely upon the defense of laches, as he might properly have done under the rules laid down by many decisions. It has been held that laches in bringing suit has the effect of requiring a higher degree of proof to establish the trust. (*Morrow v. Matthew, supra* (10 Ida., p. 437, 79 Pac. 201), quoting from 15 Am. & Eng. Ency. of Law, 2d ed., p. 1208. See, also, 39 Cyc., p. 167.)

Under the facts and circumstances of this case, we are not impelled to disturb the finding of the trial judge to the effect that plaintiffs have failed to establish a grubstake agreement. Having heard the witnesses with the opportunity of observing them while testifying, he was better qualified than an appellate court, with only the cold typewritten record before it, to determine the weight to be

given the testimony. It was primarly for him to decide whether the testimony produced on plaintiffs' behalf had clearly and satisfactorily overcome the presumption of title in decedent raised by his location, and record of the notices of location, of the mining claims in question. When the trial court has not substantially departed from the rules governing such cases in arriving at his decision, his findings will not be disturbed on appeal. (See *Morrow v. Matthew, supra.*)

It is not deemed necessary, in view of the conclusions reached, to consider other errors assigned.

Judgment affirmed. Costs to respondents.

Budge, C. J., and Givens, T. Bailey Lee and Wm. E. Lee, JJ., concur.