(July 5, 1923.)

KATE CECELIA BEDAL, Respondent, v. NELLIE PAYNE JOHNSON et al., Appellants.

[218 Pac. 641.]

SPECIFIC PERFORMANCE—ORAL CONTRACT—PUBLIC POLICY—STATUTE OF FRAUDS—ADOPTION AGREEMENTS—SOLE HEIR—COMMON LAW—MARRIED WOMEN—SEPARATE PROPERTY—LACHES—CONTRACTS—MENTAL CAPACITY—UNDUE INFLUENCE—RIGHT TO DISINHERIT CHILD UNDER ADOPTION AGREEMENT — RECEIVERS — REFEREE — APPEAL—STAY OF PROCEEDINGS.

1. An oral contract for the adoption of a child whereby the adopting persons agree to make such child their heir and leave

Publisher's Note.
1. Right of adopted child to inherit, see notes in 118 **Am. St.** 684; Ann. Cas. 1914C, 1230.

her all their property must be definite and certain and proven by clear and convincing evidence before it may be specifically enforced.

2. In an action to specifically enforce an oral contract of adoption whereby adopting persons agree to adopt a child and leave her all their property, the rule that the terms and existence of the contract must be proven by clear and convincing evidence is one primarily for the trial court, and if the trial court finds on substantial or conflicting evidence that such rule has been complied with, its finding will not be disturbed on appeal.

3. An oral contract to leave property to another on the death of the promisor does not come within the inhibition of the statute of frauds, when there has been complete performance thereof by the promisees.

4. Evidence held to show that the grantor in deeds and assignments to his wife had sufficient mental capacity to contract.

5. Where a grantor died in February, 1916, and it is sought to set aside deeds made by him in May, 1914, on the ground that he did not then have the mental capacity to make such conveyances, a finding that "for one or two years prior to his death" he was mentally incapacitated does not support an allegation of mental incapacity in May, 1914.

6. Evidence held to show that no undue influence was exerted by a wife in securing conveyances and gifts from her husband.

7. Contracts for the adoption of children were not recognized at common law.

8. A contract by which a husband and wife agreed to adopt a child and leave her all their property on their death, made in 1868 when the common law was in force in Idaho and there was no statute authorizing the adoption of children, was invalid and unenforceable.

9. Under the common law a married woman could not make a valid contract adopting a child.

10. A married woman by agreeing to adopt a child and leave her property to the child on her death did not bind her separate estate.

11. Contracts for the adoption of children are no longer opposed to the public policy of this state.

12. Where a husband and wife agreed to adopt a child and leave her all their property on their death, and on the death of his wife the husband again marries, such contract will not be enforced against the later wife who married without knowledge thereof, both because it is contrary to public policy and morals

and because its performance is harsh .and unjust to an innocent third party.

13. Where a contract for the adoption of a child was made when the common law was in force and when there was no statute of this state authorizing adoptions, and pursuant to the contract the adopting parents procured the enactment of an act by the territorial legislature, adopting the child and making her their lawful heir, the contract will be deemed consummated and binding since by the passage of the act the common-law inhibitions were removed.

14. Evidence *held* sufficient to show the acceptance of a special legislative act by the parties affected thereby.

15. Pursuant to a contract with the natural parent to adopt his child and leave her their property, the adopting parents procured the enactment by the territorial legislature of Idaho of a law which provided that the child "is hereby made the lawful and legitimate heir of said Orville P. and Rosanna C. Johnson, the same as if she were their natural child, and shall be treated as and have the same rights as an heir as if she were their natural child." The relations of parent and child were thereafter assumed and recognized for twenty-five years by the adopting parents and the child. *Held,* that the legislative act will be construed as a part of the contract, entitling the child to a child's portion of the estate of O. P. Johnson as against his attempt to disinherit her by conveyances of practically all his property to his subsequent wife.

16. Where a husband and wife procure the enactment of a legislative act by which they adopt a child and "make her their heir the same as if she were their natural child," and thereafter the relation of parent and child is assumed and recognized for twenty-five years by the adopting parents and the child, the child will be entitled to a child's share of the estate of her adopting mother on the death of the latter intestate.

17. Where one who has adopted a child and agreed to leave her his property on his death conveys in May, 1914, practically all his property to the wife of a later marriage in consideration of love and affection and thereafter dies in February, 1916, a suit begun in October, 1917, to set aside such conveyances and to enforce the adoption agreement is not barred by laches.

18. C. S., sec. 7162, provides that in cases not provided for in sec. 7157 et seq. the perfecting of an appeal stays proceedings in the court below, upon the judgment or order appealed from. C. S., sec. 7157, provides that if the judgment or order appealed from direct the execution of a conveyance or other instrument an appeal cannot be stayed until such execution. *Held,*

that after judgment directing the execution of certain conveyances by defendant, an appeal by the defendant who had failed to execute and deliver such conveyances did not prevent the appointment of a receiver after judgment as authorized by C. S., sec. 6817, subds. 3 and 4.

19. *Held*, under the same facts and for the same reason, the trial court was not prevented from appointing a referee under 'C. S., sec. 6871.

APPEAL from the District Court of the Fourth Judicial District, for Gooding County. Hon. H. F. Ensign, Judge.

Action for specific performance of a contract of adoption. Decree for plaintiff. Defendant appeals. *Reversed* and *remanded*.

Richards & Haga and Hawley & Hawley, for Appellants.

The oral agreement between O. P. Johnson and Rosanna Johnson, his wife, and respondent's father, William Alexander, on the part of the Johnsons to leave all their property to the respondent at their death could not be enforced against appellant because its enforcement would be against public policy, morals and the specific equitable principles applicable to this type of case. (Elliott on Contracts, secs. 645, 649, 652, 653; C. S., secs. 7826, 7827; 13 C. J. 462; *Lowe v. Doremus*, 84 N. J. L. 658, 87 Atl. 459, 49 L. R. A., N. S., 632; *Bradley v. Bradley*, 19 Ont. Law, 525; *Lower v. Peers*, 6 Eng. Rul. Cas. 347; *Sullivan v. Garesche*, 229 Mo. 496, 129 S. W. 949, 49 L. R. A., N. S., 605; *Knost v. Knost*, 229 Mo. 170, 129 S. W. 665, 49 L. R. A., N. S., 627.)

The agreement is unenforceable because performance would be harsh, offensive and unjust to an innocent third party. (*Johnson v. Hubbell*, 10 N. J. Eq. 332, 66 Am. Dec. 773; *Owens v. McNally*, 113 Cal. 444, 45 Pac. 710, 33 L. R. A. 369; *Sargent v. Corey*, 34 Cal. App. 193, 166 Pac. 1021; *Gall v. Gall*, 64 Hun, 600, 19 N. Y. Supp. 332; Id., 138 N. Y. 675, 34 N. E. 515; *Mayfield v. Cook*, 201 Ala. 187, 77 So. 713; *Russell v. Agar*, 121 Cal. 396, 66 Am. St. 35, 53 Pac. 926; *Wood v. Evans*, 113 Ill. 186, 55 Am. Rep. 409;

*Pugh v. Bell,* 21 Cal. App. 530, 132 Pac. 286; *Hooks v. Bridgewater,* 111 Tex. 122, 229 S. W. 1114, 15 A. L. R. 216.)

The oral agreement claimed here must be proven with a degree of certainty which is utterly lacking in the evidence presented.    There is, therefore, insufficient evidence to support the judgment.    (Moore on Facts, vol. 1, p. 152; vol. 2, p. 1291; vol. 3, p. 1304; *Rice v. Ridgley,* 7 Ida. 115, 61 Pac. 290; *Rosenwald v. Middlebrook,* 188 Mo. 58, 86 S. W. 200; *Gall v. Gall, supra; Wallace v. Rappleye,* 103 Ill. 229; *Forsyth v. Heward,* 41 Nev. 305, 170 Pac. 21; *Monsen v. Monsen,* 174 Cal. 97, 162 Pac. 90.)

Such contracts have in many states been held void under statutes of frauds similar to the statute in force in the territory of Idaho in 1868.    (*Austin v. Davis,* 128 Ind. 472, 25 Am. St. 456, 26 N. E. 890, 12 L. R. A. 120; *Wallace v. Long,* 105 Ind. 522, 55 Am. St. 222, 5 N. E. 666; *Swash v. Sharpstein,* 14 Wash. 426, 44 Pac. 862, 32 L. R. A. 796; *Wood v. Evans,* 113 Ill. 186, 55 Am. Rep. 409; *Shahan v. Swan,* 48 Ohio St. 25, 29 Am. St. 517, 26 N. E. 222; *Grant v. Grant,* 63 Conn. 530, 38 Am. St. 379, 29 Atl. 15; *Dicken v. McKinley,* 163 Ill. 318, 54 Am. St. 471, 45 N. E. 134; *Pond v. Sheean,* 132 Ill. 312, 23 N. E. 1018, 8 L. R. A. 414; *Blakely v. Sumner,* 62 Wash. 206, 113 Pac. 257; *Trimble v. Donahey,* 96 Wash. 677, 165 Pac. 1051; *Grindling v. Rehyl,* 149 Mich. 641, 113 N. W. 290, 15 L. R. A., N. S., 466.)

Where oral contracts of the kind relied upon by respondent have not been declared void under the statutes of fraud, the courts have uniformly viewed them with suspicion, for the lips of the deceased are closed by death, or the time that has elapsed is so great that no human being could testify with certainty as to what was said, and the testimony becomes merely the opinion of the witness, based upon a vague recollection, instead of a statement of fact from which the court may determine the legal effect of the words or language used by the parties.    (*In re Healy's Estate,* 6 Cal. Unrep. 780, 66 Pac. 175; *Russell v. Agar, supra; Owens v. McNally, supra; In re Hayden's Estate,* 1 Cal. App. 75, 81 Pac. 668; *Shahan v. Swan, supra.)*

Contracts for the adoption of children were not recognized by the common law. They were repugnant to its principles and exist in the United States only by virtue of statutes authorizing adoption and the release of the parents from their responsibility for the support and care of the child. (1 Am. & Eng. Ency. of Law, p. 726; 1 C. J., pp. 1370, 1371; 21 Am. & Eng. Ency. of Law, p. 1039; 1 Page on Contracts, sec. 427; *People v. Mercein,* 3 Hill (N. Y.), 399, 38 Am. Dec. 644; *Wall v. McEnnery's Estate,* 105 Wash. 445, 178 Pac. 631; *Davis v. Jones' Admr.,* 94 Ky. 320, 42 Am. St. 360, 22 S. W. 331.)

Such contracts would not be enforceable in equity, for there is no mutuality; they would not be binding upon the parent, as he could retake the child at will. (1 Page on Contracts, sec. 427; *Stapleton v. Pointer,* 111 Ky. 264, 98 Am. St. 411, 62 S. W. 730, 53 L. R. A. 784; 29 Cyc. 1591; *State v. Baldwin,* 5 N. J. Eq. 633, 45 Am. Dec. 399.)

There was no law in the territory in 1868 permitting the adoption of children or releasing a parent from his parental duties under a contract such as the one pleaded in the complaint, and the contract was therefore contrary to public policy, not binding upon respondent's father, and not enforceable in any court. (1 Page on Contracts, sec. 427; 2 Ency. L. & P. 217; *Humphries v. Davis,* 100 Ind. 274, 50 Am. Rep. 789; *Ross v. Ross,* 129 Mass. 243, 37 Am. Rep. 321.)

The alleged agreement of 1868 would deprive the children of O. P. Johnson and Rosanna Johnson of the right to inherit from their parents and would prohibit the parents from giving to their children gifts of money or property to start them in business or for their maintenance and support. The agreement would also operate as a restraint on remarriage either by O. P. Johnson or Rosanna C., and the effect of the agreement would thus be to leave them without that comfort, care and assistance in old age which only members of their family can give. Agreements having such tendency are universally held invalid on the ground of public policy. (13 C. J. 462; *Lowe v. Doremus, supra; Bradley v.*

*Bradley, supra; Lowe v. Peers, supra;* Elliott on Contracts, secs. 645, 649, 652 and 653.)

In 1868 there was no statute in the territory providing for the wife holding separate property; the property rights of married persons were governed by the common law, and under the common law the husband, upon marriage, became possessed of any property which the wife had at the time of her marriage. (*Mackall v. Mackall,* 135 U. S. 167, 172, 10 Sup. Ct. 705, 34 L. ed. 84; 15 Am. & Eng. Ency. of Law, 790, 791, 820, 832.)

Under the common law the contract of a married woman was absolutely void. (21 Cyc. 1209; 15 Am. & Eng. Ency. of Law, 790, 791.)

Appellant perfected her appeal from the judgment on June 5, 1919; the trial court then was divested of jurisdiction of the cause, and the order appointing the receiver, dated June 11 and filed June 14, 1919, is ineffectual, for the court was without jurisdiction to enforce the judgment through the aid of a receiver. (*Havemeyer v. Superior Court,* 84 Cal. 327, 18 Am. St. 192, 24 Pac. 121, 10 L. R. A. 627; *White v. White,* 130 Cal. 597, 80 Am. St. 150, 62 Pac. 1062; High on Receivers, 4th ed., secs. 403, 404; C. S. 7162.)

Johnson & Nixon, for Respondent.

An oral contract to leave property to another on the death of the promisor will be enforced in equity, where the contract is clear, definite and certain, and not inequitable or unjust to innocent third parties, and there has been performance on the part of the promisee and the one for whose benefit the contract was made. (*Steinberger v. Young,* 175 Cal. 81, 165 Pac. 432; *Rogers v. Schlotterback,* 167 Cal. 35, 138 Pac. 728; *Owens v. McNally,* 113 Cal. 444, 45 Pac. 710, 33 L. R. A. 369; *Owens v. McNally,* 124 Cal. 29, 56 Pac. 615; *McCabe v. Healy,* 138 Cal. 81, 70 Pac. 1008; *Stewart v. Smith,* 6 Cal. App. 152, 91 Pac. 667.)

Enforcement of this agreement is not inequitable or a hardship as to defendant whose legal rights were fully protected by the judgment. (*Dillon v. Gray,* 87 Kan. 129, 123

Pac. 878; *Healy v. Healy,* 55 App. Div. 315, 66 N. Y. Supp. 927; *Van Natta v. Heywood,* 57 Utah, 376, 195 Pac. 192; C. S., sec. 7975, and Idaho cases cited in note; *Winne v. Winne,* 166 N. Y. 263, 82 Am. St. 647, 59 N. E. 832; *Middleworth v. Ordway,* 49 Misc. Rep. 74, 98 N. Y. Supp. 10; *Broemling v. Broemling,* 202 Mich. 474, 168 N. W. 431; *Lee v. Bemmingham,* 199 Ill. App. 497; *Roberts v. Roberts,* 223 Fed. 775, 138 C. C. A. 102; *Lynn v. Hockaday,* 162 Mo. 111, 85 Am. St. 480, 61 S. W. 885; *Healy v. Simpson,* 113 Mo. 340, 20 S. W. 881; *Quinn v. Quinn,* 5 S. D. 328, 49 Am. St. 875, 58 N. W. 808.)

The act of the legislature approved January 12, 1875, taken in connection with the agreement, shows that it was the intention of the parties that upon the death of the survivor of O. P. and Rosanna C. Johnson, plaintiff would be entitled to what property they left, subject to the community property rights of the widow of O. P. Johnson should he again marry. (*Gates v. Gates,* 54 N. Y. Supp. 454, citing *Rhodes v. Rhodes,* 3 Sand. Ch. 279; 1 C. J. (tit. "Adoption"), p. 1397; *Heath v. Heath,* 18 Misc. Rep. 521, 42 N. Y. Supp. 1087; *McGinley's Estate,* 257 Pa. 478, 101 Atl. 808; *Svanburg v. Fossen,* 75 Minn. 350, 74 Am. St. 490, 78 N. W. 4, 43 L. R. A. 427; *Sayles v. Christie,* 187 Ill. 420, 58 N. E. 480; *Pace v. Klink,* 51 Ga. 220.)

Where the adoption statute was acted upon by the parties for many years, it is presumed to have been accepted, and neither the parties adopting nor their heirs after their death can contest or set up any irregularities in such proceedings. (*Crawford v. Wilson,* 139 Ga. 654, 78 S. E. 30, 44 L. R. A., N. S., 773; *Lynn v. Hockaday, supra; Martin v. Martin,* 250 Mo. 539, 157 S. W. 575; *Chehak v. Battles,* 133 Iowa, 107, 12 Ann. Cas. 140, 110 N. W. 330, 8 L. R. A., N. S., 1130; *Estate of Evans* (Cal.), 39 Pac. 860; *Estate of Johnson,* 98 Cal. 531, 33 Pac. 460, 21 L. R. A. 380; *Estate of Williams,* 102 Cal. 70, 11 Am. St. 163, 36 Pac. 407; *Van Matre v. Sankey,* 148 Ill. 536, 39 Am. St. 196, 36 N. E. 628, 23 L. R. A. 665; *Appeal of Wolf* (Pa.), 13 Atl. 760; *Nugent v. Powell,* 4 Wyo. 173, 62 Am. St. 17, 33 Pac. 23, 20 L. R. A.

199; *Cubitt v. Cubitt*, 74 Kan. 353, 86 Pac. 475; *Milligan v. McLaughlin*, 94 Neb. 171, 142 N. W. 675, 46 L. R. A., N. S., 1134; *In re McKeag Estate*, 141 Cal. 403, 99 Am. St. 80, 74 Pac. 1039; *Parsons v. Parsons*, 101 Wis. 76, 70 Am. St. 894, 77 N. W. 147.)

Where the promisor in his lifetime did not take steps to annul the agreement on the ground that the other party had not complied with it, or was unworthy, his heirs or personal representatives are in no position to do so. (*Kelley v. Devin*, 65 Or. 211, 132 Pac. 535; *Wold v. Wold*, 138 Minn. 409, 165 N. W. 229; *Signaigo v. Signaigo* (Mo.), 205 S. W. 23; *Evans v. Moore*, 247 Ill. 60, 139 Am. St. 302, 93 N. E. 118; *Burns v. Smith*, 21 Mont. 251, 69 Am. St. 693, 53 Pac. 742; *Brackenbury v. Hodgkin*, 116 Me. 399, 102 Atl. 106.)

Plaintiff is not chargeable with laches. Her right of action accrued at the death of O. P. Johnson. (*Rogers v. Schlotterback*, 167 Cal. 35, 138 Pac. 728; *Steinberger v. Young*, 175 Cal. 81, 165 Pac. 432; *Evans v. Moore, supra; Wold v. Wold*, 138 Minn. 409, 165 N. W. 229; *Quirk v. Bank of Commerce*, 244 Fed. 682.)

The money judgment was proper as to proceeds of sale of Home ranch. (*Messer v. Hibernia Sav. & Loan Soc.*, 149 Cal. 122, 84 Pac. 835; *Thresher v. Stonington Sav. Bank*, 68 Conn. 201, 36 Atl. 38; *Maris v. Masters*, 31 Ind. App. 235, 67 N. E. 699; *Summers v. Wortham*, 23 Ky. Law, 571, 63 S. W. 436; *Cheney v. Gleason*, 125 Mass. 166; *Lyle v. Addicks*, 62 N. J. Eq. 123, 49 Atl. 1121; *Monbray v. Dieckman*, 9 App. Div. 120, 41 N. Y. Supp. 82; *Max Meadows Land & Imp. Co. v. Bridges*, 95 Va. 184, 27 S. E. 839.)

Appointment of receiver and referee after judgment was proper. (C. S., secs. 4329, 4415.)

FLYNN, Commissioner.—This is a case of first impression in this court. Plaintiff claims that in 1868, when she was about a year old, her father made an oral contract with O. P. Johnson and wife, whereby the father turned plaintiff over to them and surrendered his rights as a father, in consideration of which the Johnsons agreed to legally adopt

plaintiff and make her their heir and upon their death leave her all their property. Plaintiff seeks specific performance of this contract against the surviving widow of O. P. Johnson, who married him in 1906, without notice or knowledge of the alleged agreement.

Plaintiff alleges that in 1914, O. P. Johnson, who was then 83 years old, in violation of the alleged adoption agreement, by deed dated May 25, 1914, for the consideration stated therein to be love and affection, conveyed to his wife, Nellie Payne Johnson, appellant herein, practically all his real estate including lands claimed by plaintiff to be the separate property of his first wife, and also assigned to her notes, securities and moneys, the total value of the property, real and personal, being, as plaintiff is informed and believes, more than $300,000. O. P. Johnson died testate, on or about February 9, 1916, leaving no natural children surviving him. His will, dated February 3, 1909, was presented for probate on November 10, 1917, by his widow, Nellie Payne Johnson, the application for probate excusing the delay by reciting that practically all his estate had been disposed of prior to his death and that the application was made partly because of the filing of this suit and the allegations therein contained. The will bequeathed the sum of $50 to the respondent herein and the balance of testator's property was bequeathed and devised thereby to Nellie Payne Johnson and Orville P. Johnson, Jr., a son of O. P. Johnson by his second wife. The second wife died on or about August 15, 1906, and the son died in 1912.

Covering, as it does, the testimony of more than three score witnesses and numerous incidents in a period of nearly fifty years, the record is exceedingly voluminous. Therein is unfolded a tapestry on which is depicted the romance of an Idaho pioneer, and though the picture is marred and spotted by ungentle handling and in places torn to shreds in the struggle for the threads of gold that glisten in its weave, it is perhaps necessary to a clear understanding of the facts that we attempt prosaically to reconstruct its salient features.

Born in Tennessee in 1832, O. P. Johnson came to California in 1849, and thereafter drifted to Oregon where for many years he bore the significant name of "Poker" Johnson. In the fall of 1867 we find him and his first wife, Rosanna Johnson, keeping a wayside inn or roadhouse at Horseshoe Bend, Boise county, Idaho Territory, a few miles from Placerville, in the famous Boise Basin. He was then about thirty-five years old and his wife about twenty-five. They were childless and possessed little of the world's goods. That year, William Alexander, a miner, and his wife came to the placer mining camps bringing with them their infant child about four or five months old, the respondent herein. Mrs. Alexander died in May, 1868. The baby was cared for by a neighbor for a short time, and then put in charge of Mrs. Rosanna Johnson by the father with an agreement to pay for its care. In the fall of 1868, Alexander came in from his mining claim and being then several months in arrears on the payments for the baby's care, he was asked to pay therefor or to give up the baby to Mrs. Johnson. After considerable discussion he finally reluctantly agreed to the proposal of the Johnsons, which is the basis of this action, that if he would give them the child as their own they would adopt the child and make her their heir and that she would have all the property they might leave at their death. Boise county was then in its early development, a mining country, with few women who might care for the child, and Alexander considered that this was the best thing he could do for her under the circumstances. In November, 1869, on his own application, Johnson was appointed guardian of the person of respondent by the probate court of Ada county.

Shortly thereafter, the Johnsons moved from Horseshoe Bend to Whitley Bottoms, on the Snake River, taking with them the child and a half-breed Indian boy, whom they were rearing, and driving their herd of thirty-five or forty cattle. There Johnson engaged in the cattle business out of which grew the fortune contended for in this suit. In 1874 Alexander called on the Johnsons and threatened to take

37 Idaho.—24

the child away. The same agreement made in 1868 was again made by the parties, and, in pursuance thereof, Johnson, in 1875, procured the enactment of a special act of the legislative assembly of Idaho, which provided that

"Whereas, Orville P. and Rosanna Cecilia Johnson . . . . have adopted Kate Alexander, an orphan and minor about eight years old as their child, and desire her to bear their name and to be their heir, and they have requested the passage of the Act in this form:

"Therefore Be It Enacted . . . .

"Section 1. [Changes the name of Kate Alexander to Kate Cecilia Johnson.]

"Section 2. That Orville P. and Rosanna C. Johnson are hereby appointed and made the guardians of said Kate Cecilia Johnson, and shall have the care and custody of her person until she becomes of lawful age; and the said Kate Cecilia Johnson is hereby made the lawful and legitimate heir of said Orville P. and Rosanna C. Johnson, the same as if she were their natural child, and shall be treated as and have the same rights as an heir as if she were their natural child; provided they file with the Secretary of Idaho Territory their written and duly acknowledged consent and acceptance of this Act."

From the time she was first taken into their household the Johnsons treated respondent as their child and she in turn looked upon them as her parents, not knowing till her father's appearance in 1874 that she was not their natural child. After the passage of the aforesaid act, her natural father dropped out of respondent's life. The Johnsons sent her to school and she performed the ordinary duties of a daughter and assumed the ordinary privileges, including that of making a runaway marriage, when she was about 14 years old, to a worthless fellow from whom she was soon divorced; and on April 20, 1884, two days after the decree of divorce was signed, she married Richard Tucker. She and her husband took up their residence with the Johnsons at Boise and thereafter moved with them to the Hagerman Valley, and there lived together for many years. Three

children were born to respondent as the result of the Tucker marriage. She secured a divorce from Tucker on the advice of the Johnsons in 1891, and in 1894 she married Harry Sprowls, with whom she and her children resided at the Johnson ranch until 1900. Her third husband died in February, 1900, shortly before the death of Mrs. Rosanna Johnson in March, 1900. In June, 1900, respondent and her children left the Home ranch. Whether her departure was occasioned by the immoral conduct of O. P. Johnson with a woman during the last days of his wife and thereafter, or the fact that Johnson believed that respondent had tried to get the Chinese cook to poison him, both of which versions are supported by abundance of testimony, the fact is that the parting of the ways had come for respondent and Johnson. From that time on their intimacy ceased, though Johnson in 1913 and 1914 frequently met the respondent, sometimes casually, sometimes by appointment, but never at his home. When his second wife died, he sent for respondent's daughter to care for his son Orville P., Jr., and afterward helped to educate this daughter, Susie, and received letters from her. As against these meetings and this conduct, there are in evidence many statements of Johnson showing that he was estranged from respondent and embittered toward her. Among other things showing this estrangement was a will made by him in July, 1906, in which he bequeathed to respondent "the sum of $50 and no more," the same provision being in the 1909 will.

In August, 1900, O. P. Johnson petitioned the probate court of Lincoln county for letters of administration and obtained a decree distributing to him as sole heir of Rosanna Johnson the property of said Rosanna Johnson, on the ground that it was all common property acquired after her marriage. This property included the Home and the Riley ranches which the trial court finds to have been the separate property of Rosanna Johnson. The Home ranch, however, was by a decree of the probate court set aside as a probate homestead for the use of the family of Rosanna Johnson.

In February, 1901, Johnson married the second time, to Mary Josephine Sullivan. She died on August 15, 1906, after having borne to him a son, christened O. P. Johnson, Jr., born on the 14th day of February, 1902. After the death of the boy's mother, Johnson was unable to take care of him because of his business interests, and one of his intimate friends suggested appellant as governess for the boy; and an arrangement was soon thereafter made by which appellant, on October 1, 1906, took up her residence at Johnson's ranch in Hagerman Valley to look after the child's welfare. On November 12, 1906, appellant and Johnson were married and lived together until he died in California on February 9, 1916. At the time of the marriage, appellant was about forty-six years of age and Johnson was seventy-three. During their married life she gave him every attention and their relations were happy, with the exception that Johnson apparently felt that his meetings during 1913 and 1914 with respondent would be distasteful to his wife, and, therefore, such meetings were held away from home, and any letters he had from Susie, respondent's daughter, were sent to him at his request in the care of others.

According to the testimony of Judge Richards, his attorney, Johnson was the moving party in making the conveyances and transfers complained of, dated May 25, 1914, and acted without coercion and wholly planned the disposition of the property. After her husband's death, appellant continued in possession of the property which had then been conveyed to her, and· about twenty months after Johnson's death this suit was begun.

Other facts in connection with the lives of the parties as affecting the issues will necessarily be adverted to in this opinion, but the foregoing is an outline of the important features.

The trial court found that the agreement relied on was made; that it was valid and enforceable, not against public policy, not violative of the statute of frauds, not void and unenforceable against appellant on her claim of lack of

knowledge thereof at the time of her marriage; that for one or two years prior to his death Johnson was afflicted physically by diseases and ailments so that he was mentally incapable of intelligently executing conveyances of valuable property; that certain property included in such conveyances was the separate property of Johnson's first wife and certain other property was Johnson's separate property; that respondent was entitled to a decree of specific performance of the adoption agreement and entitled to all the separate property of Rosanna Johnson and all the separate property of O. P. Johnson and one-half the community property which he conveyed to appellant; that she should receive from appellant the sum of $40,000 with interest in the sum of over $5,000, being the purchase price of some of the lands sold by appellant after Johnson's death; that an accounting be had of all the personal property transferred by Johnson to his wife, and that judgment be rendered for the full amount thereof. A receiver was subsequently appointed for the purpose of collecting the assets and appellant was directed in the order appointing the receiver to file an account and deliver the property to the receiver. The receiver was directed further to ascertain and designate the separate and community property. From the judgment, from the order denying appellant's motion for a new trial and from the order appointing a receiver, appeals were taken and by stipulation consolidated for hearing.

Appellant's first contention is that the agreement on which this action is based must be proved with a degree of certainty which is utterly lacking in the evidence and that there is therefore insufficient evidence to support the judgment. That such a contract as this must be proved by clear, satisfactory and convincing evidence, that the contract and the evidence tending to support its existence must be scrutinized with particular care, and that only upon a satisfactory showing that it is definite and certain will it be enforced, is generally supported by the authorities. (Moore on Facts, vol. 1, p. 152; vol. 2, p. 1291; vol. 3, p. 1304; *Rice v. Ridgley*, 7 Ida. 115, 61 Pac. 290; *Rosenwald v. Middlebrook*, 188

Mo. 58, 86 S. W. 200; *Gall v. Gall,* 64 Hun, 600, 19 N. Y. Supp. 332; *Kinney v. Murray,* 170 Mo. 674, 71 S. W. 197; *Wallace v. Rappleye,* 103 Ill. 229; *Forsyth v. Heward,* 41 Nev. 305, 170 Pac. 21; *Monsen v. Monsen,* 174 Cal. 97, 162 Pac. 90.)

Three witnesses testify positively that they heard the making of the agreement as alleged. One of the witnesses was the half-breed Indian boy, then about eight years old. On cross-examination, the exact words of the agreement could not be given by them and there was uncertainty in some of their answers as to the agreement being merely one for adoption or whether it included the provision that she should be their sole heir as stated on their direct examinations. Mrs. Banville, who, in 1868, was a girl of a little over 14 years old, testified that both Mrs. Johnson and Alexander, prior to the agreement, on separate occasions had mentioned that they were going to make the agreement as relied on here. Numerous witnesses testified that they had heard the Johnsons, together and separately, state that they had adopted respondent and that she was to have all their property on their death. Such statements of the Johnsons were made frequently at various places and were made by Johnson up to the year 1906, though after 1900 he is shown to have made contrary statements. Certainly, there is substantial evidence to support the conclusion of the trial court that the contract was made as alleged, and, on the record, we cannot say that it was not clear and convincing within the rule above announced. The rule, as we understand it, is that while it is a prerequisite to the specific enforcement of such a contract that both its existence and its terms be proved by clear and convincing evidence, the clearness and convincing force of the evidence is a question primarily for the trial court, and if the trial court finds on substantial evidence, or on conflicting evidence, that the contract was made and is definite and certain, such finding of fact will not be disturbed on appeal. (*Panhandle Lumber Co. v. Rancour,* 24 Ida. 603, 135 Pac. 558; *Steinberger v. Young,* 175 Cal. 81, 165 Pac. 432; *Winne v. Winne,* 166 N. Y. 263, 82 Am.

St. 647, 59 N. E. 832; *Bromeling v. Bromeling,* 202 Mich. 474, 168 N. W. 431.)

Assuming, then, the existence of the contract, the next objection urged is that the contract being oral was violative of the statute of frauds as it existed at the time of the making of the contract, the statute not then providing for the specific performance of contracts that had been partially performed. (First Sess. Laws 1864, p. 540.)

The statute, however, did provide that it should not be construed to prevent any trust arising or being extinguished by operation of law nor to abridge the power of courts to compel the specific performance of such agreements. While it is true that in many of the states such contracts have been held void under statutes of frauds similar to our statute then in force (*Austin v. Davis,* 128 Ind. 472, 25 Am. St. 456, 26 N. E. 890, 12 L. R. A. 120; *Hooks v. Bridgewater,* 111 Tex. 122, 229 S. W. 1114, 15 A. L. R. 216; *Dicken v. Mc-Kinley,* 163 Ill. 318, 54 Am. St. 471, 45 N. E. 134; *Grindling v. Rehye,* 149 Mich. 641, 113 N. W. 290, 15 L. R. A., N. S., 466, and cases cited in the note thereto), we believe that the weight of authority supports the view that an oral contract to leave property to another on the death of the promisor does not come within the inhibition of the statute of frauds when there has been part performance thereof on the part of the promisee and the one for whose benefit the contract was made. (*Steinberger v. Young,* 175 Cal. 81, 165 Pac. 432; *Healy v. Healy,* 55 App. Div. 315, 66 N. Y. Supp. 927; *Van Natta v. Heywood,* 57 Utah, 376, 195 Pac. 192; *Bromeling v. Bromeling, supra; Quinn v. Quinn,* 5 S. D. 328, 49 Am. St. 875, 58 N. W. 808; *Van Dyne v. Vreeland,* 11 N. J. Eq. 370; Id., 12 N. J. Eq. 143; *Sutton v. Hayden,* 62 Mo. 101; *Sharkey v. McDermott,* 91 Mo. 647, 60 Am. Rep. 270 and note, 4 S. W. 107; *Bassett v. American Baptist Pub. Soc.,* 215 Mich. 126, 183 N. W. 747, 15 A. L. R. 213.)

In this case it is clear that respondent's father finally surrendered her completely to the custody and control of the Johnsons, made no claim to her after the statute of adoption of respondent was passed by the territorial legislature in

1875, and, so far as the record shows, never saw her thereafter and that the relations of parent and child were from the beginning mutually assumed and acknowledged by the Johnsons and the respondent for a period of over 30 years. Such facts clearly take the case from the *onus* of the statute, for they show not only part performance, but complete performance on the part of the promisees. If there were no other valid objections or equities intervening, it would be unconscionable and inequitable in a court of equity to refuse the recognition and enforcement of a contract so recognized and acted on as the one at bar and completely carried out by one of the parties.

The next objection urged is that where oral contracts of the kind relied on by respondent have not been declared void under the statute of frauds, the courts have uniformly viewed them with suspicion, for the lips of the deceased are closed by death, and the parties who would know of the transaction are usually dead or lapse of time so dims their memories that their testimony becomes merely opinions of what was said, based upon a vague recollection, instead of a statement of fact from which the court may determine the legal effect of the words or language used by the parties. In support thereof appellant cites *In re Healy's Estate,* 6 Cal. Unrep. 780, 66 Pac. 175; *Russell v. Agar,* 121 Cal. 396, 66 Am. St. 35, 53 Pac. 926; *Owens v. McNally, supra; In re Hayden's Estate,* 1 Cal. App. 75, 81 Pac. 668; *Shahan v. Swan,* 48 Ohio St. 25, 29 Am. St. 517, 26 N. E. 222. This objection has been met and answered in our discussion of the first contention theretofore mentioned.

We pass, then, to another point made by appellant that when the alleged contract was entered into in 1868 Rosanna Johnson had no separate property, as the property rights of married persons were governed by the common law; that upon marriage the husband became possessed of any property that his wife might have at the time of the marriage; and the alleged contract therefore was entered into under the common-law rule then prevailing. The amended complaint alleges that at the time of her marriage to O. P.

Johnson, Rosanna Johnson was a widow and possessed the sum of about $20,000 inherited from her former husband. The trial court makes no finding on this allegation and we have not found any evidence supporting it. The complaint further states that during the marriage she acquired certain real and personal property purchased with her separate funds, among which were the Home ranch and the Riley ranch, the latter being a desert entry and patent therefor being issued to Rosanna Johnson in her own name. The trial court found that the Home ranch, containing about 600 acres, became the separate property of Rosanna Johnson by an agreement between her and O. P. Johnson in consideration of said Rosanna Johnson consenting to the sale by said O. P. Johnson of what is known as the Hawthorn block in the city of Boise, which was the former home of the Johnsons and the separate property of Rosanna Johnson; that a portion of the Home ranch consisting of 160 acres, known as the Tucker homestead, containing the dwelling-house, had been conveyed to Rosanna Johnson by the respondent here and her husband by deed dated July 3, 1888; and that O. P. Johnson at all times prior to the death of Rosanna Johnson had acknowledged that these parcels of land were the separate property of Rosanna Johnson.

The evidence shows that, just before her death, Rosanna Johnson wanted to make a will giving her separate property to the respondent, but O. P. Johnson objected and requested her to let him have the use of her separate property during his lifetime, and that he would arrange to have respondent get the property when he died; and that at the request of Rosanna Johnson, O. P. Johnson then took an oath on the family Bible that he would carry out this arrangement; that relying on said oath and promise the said Rosanna Johnson made no will and died intestate. After her death, according to respondent's testimony, O. P. Johnson told respondent that she need not do anything at all about the estate of Rosanna Johnson but that he would arrange it so that it would go to her after his death and that respondent and her children should continue to live with him at the Home

ranch; that he would have the Home ranch set apart as a homestead and the remaining separate property of Rosanna Johnson so fixed that it would upon his death go to the respondent together with property which he might own at that time; that respondent consented to this arrangement and relying on the statements and promises took no legal steps to assert her rights against the estate of Rosanna Johnson. Thereafter, on the 11th of January, 1902, O. P. Johnson procured an order from the probate court setting apart the Home ranch as a homestead for the use of the family of the deceased Rosanna Johnson and had the Riley Ranch decreed him as the sole heir of Rosanna Johnson, said ranch being claimed and found to be community property.

In her brief, respondent states that "the validity of these probate proceedings might well be attacked, but it is unnecessary to go into this question, because, under the agreement . . . . plaintiff was entitled to this property upon the death of O. P. Johnson regardless of how he acquired it or whether it was the separate property of Mrs. Johnson or not." Though it be true that Mrs. Johnson could make no valid contract binding her separate estate, the adoption of respondent by Mrs. Johnson and her husband was valid and effective. By virtue of this adoption, respondent took the status of a natural child in respect of her right of inheritance, and under the statutes then in force, one-half of the separate property of Rosanna Johnson became vested in respondent at the death of Rosanna Johnson, intestate. (*Glover v. Brown,* 32 Ida. 426, 184 Pac. 649.)

We believe it unnecessary to determine whether the probate proceedings before mentioned are void or whether respondent is barred by her laches to attack such proceedings, because the record shows that all the separate property of Rosanna Johnson was afterward taken possession of by O. P. Johnson and held intact up to the time of the conveyances to appellant in May, 1914. The same result will be attained whether we say that respondent was entitled to one-half the separate property of Rosanna Johnson at her death, or to one-half of Johnson's separate property (which included

Rosanna Johnson's separate property) at the time he attempted to dispose of it in May, 1914.

The next point raised relates to the incapacity of O. P. Johnson to make the conveyances to appellant which are sought to be set aside for alleged undue influence. The complaint alleges that at the time of the making of the deeds and assignments to appellant in May, 1914, O. P. Johnson was feeble both mentally and physically and easily influenced, and that except for the improper influence of appellant he would have carried out the agreement upon which this suit is based. On this allegation the trial court finds that ''for one or two years prior to his death'' O. P. Johnson was afflicted with various physical ailments which so affected his mental condition as to render him incapable during that time of intelligently executing conveyances of valuable property. This finding does not support an allegation of mental incapacity in May, 1914, Johnson having died in February, 1916. There is no finding on the question of undue influence. On examination of the evidence, which it will be unnecessary to state in detail, we think that it is clear therefrom that Johnson had the mental capacity to dispose of his property in May, 1914, and likewise that he was not unduly influenced by appellant. Respondent in her brief states that these questions are immaterial and therefore we shall not further discuss them.

Appellant takes her next stand on a set of objections attacking the validity of the adoption of respondent by the Johnsons in 1868, which objections, for the purpose of conciseness, may be grouped in a general statement, to wit: That contracts for the adoption of children were not recognized at common law; that the common law was the only law in force in Idaho at the time of the purported adoption; that there was no mutuality in the contract of adoption, and, therefore, the child could be retaken at will by the father; that public policy forbids a parent to attempt to shirk the responsibility of care, education and training of his child, and that as there was no statute in Idaho at that time permitting the adoption or release of the parents' natural re-

sponsibility, the contract in question was contrary to public policy. Counsel has cited many authorities in support of the foregoing propositions, among which are, 1 C. J., pp. 1370, 1371; 1 Page, Contracts, sec. 427; *People v. Mercein,* 3 Hill (N. Y.), 399, 38 Am. Dec. 644; *Hibbette v. Baines,* 78 Miss. 695, 29 So. 80, 51 L. R. A. 839; *Hernandez v. Thomas,* 50 Fla. 522, 111 Am. St. 137, 7 Ann. Cas. 446, 39 So. 641, 2 L. R. A., N. S., 203; *State v. Baldwin,* 5 N. J. Eq. 633, 45 Am. Dec. 399; *Ross v. Ross,* 129 Mass. 243, 37 Am. Rep. 321; *Wall v. McEnnery's Estate,* 105 Wash. 445, 178 Pac. 631; *Davis v. Jones' Admr.,* 94 Ky. 320, 42 Am. St. 360, 22 S. W. 331. The authorities supporting such contracts are nearly all collected in the note to the case of *Hooks v. Bridgewater* in 15 A. L. R. 224 et seq., and it will be found in an examination thereof that most of them do not deal with the validity of such contracts when made under the common-law inhibition.

In *Wall v. McEnnery's Estate (supra),* the court distinguishes between contracts for adoption attempted to be made under the common law and those made where there was statutory authority for adoption and a failure to pursue the statutory method. The court says:

"But in almost all the cases relied on there might have been a legal statutory adoption. The parties attempted to do that which had the sanction of the law, but failed to pursue the statutory method, or, the contract, being otherwise legal, failed for want of some formality. . . . . The relation, whether founded in decree, contract, or the equities arising out of an agreement to adopt, had the sanction of statute. To hold that a contract to adopt would give a right of inheritance in the absence of a statute permitting such relation would be to hold that that could be done indirectly which could not be done directly.

"If there can be no adoption by contract, it follows that equity cannot enforce an agreement to adopt; for the subject matter of the contract had no countenance in law at the time the writing was entered into. Equity will take jurisdiction to do justice in all those things whereof the law by

reason of its universality is deficient, and it will give a remedy for every wrong, but will not create a legal right in the absence of legislation or some sustaining principle of the common law. Equity is essentially and thoroughly remedial, and it will never extend its hand to defeat the policy of the law.

"The policy of the law may be declared by legislative enactment, or if the common law be certain by the want of legislative enactment—the adoption of children being in derogation of common law, and there being no statutory method provided by the legislature at the time the contract is said to have been entered into—it logically follows that there can be no adoption from which a right of inheritance would flow unless it is accomplished by or through some method recognized by law, either under a general law, or by special act of the law-making power. The mere living of a child with those who have assumed a care and custody over its person will not make an adoption, although the child may believe that it has been adopted, and such belief may be sustained by family tradition or by neighborhood gossip."

In addition to the fact that the common law prevented either of the Johnsons from making a contract of adoption, there is another reason especially applicable to Mrs. Johnson. At the time of the alleged agreement in 1868, the laws of Idaho gave the husband the management and control of his wife's separate property during the continuance of the marriage. (Laws 1867, c. 9, sec. 6, p. 65.) She could not enter into a contract to bargain, sell or convey her separate property or contract with reference to the same. The common law prevented her from making a contract of adoption. (*Carroll's Estate*, 219 Pa. 440, 123 Am. St. 673, 68 Atl. 1038; *Austin v. Davis*, *supra*.)

In this state the common-law disability of married women to enter into contracts still remains except when the same has been removed by legislative grants of power. (*Meier & Frank Co. v. Bruce*, 30 Ida. 732, 168 Pac. 5.) The fact that C. S., sec. 4684, requires the consent of both husband and wife to the adoption of a child by either of them nega-

tives the idea that the common-law disability of a married woman in this respect has even yet been removed. We do not think that this contract could be construed to be one for her own use and benefit or for the benefit of her separate estate, even though the statutes at that time should have permitted her to make such a contract, and the statutes did not so permit. C. S., sec. 4657, giving a married woman absolute power over her separate property and taking the control and management thereof away from the husband, as had previously been the law, was not enacted until some years after the death of Mrs. Rosanna Johnson. Therefore, Mrs. Johnson did not bind her separate estate by the contract of adoption.

We must therefore conclude that the contract of adoption and "sole heirship" made by the Johnsons in 1868 at a time when the common law was in force in this state and when there was no statute authorizing adoptions is invalid and unenforceable. We do not understand that respondent contends that the agreement for sole heirship could be enforced apart from the contract of adoption. In view of the foregoing conclusion, we deem it unnecessary to analyze *seriatim* the numerous cases cited upholding agreements of adoption. In our opinion, they do not contravene the conclusion we have reached on this point. In passing, we may say that some of the reasons given in the foregoing group of objections are no longer applicable, and we mention this in connection with the legislative act of adoption, which we shall discuss later. Contracts for the adoption of children are no longer opposed to the public policy of this state, which is in accord with the rule in all the states. (1 C. J. 1372.) So far as our research has availed us, the special act of the territorial legislature of 1875, heretofore mentioned, under which respondent was adopted by the Johnsons, is the first expression of the policy of the state on this subject. Thereafter, in 1879, was enacted the law regulating the manner of adopting minor children (Laws 1879, p. 8), which is the basis of our present law. (C. S., secs. 4682–4691, incl.)

The most important and final objections to the validity
of the agreement are: First, that the agreement cannot be
enforced because it offends public policy and morals; sec-
ondly, that it is unenforceable because performance would
be harsh, offensive and unjust to an innocent third party.
As to the objection that the contract offends public policy
and morals, appellant argues that the enforcement of such a
contract means the disinheritance of any children that might
subsequently be born to either of the Johnsons or subse-
quently adopted by them; that it deprived Johnson of the
right to subsequently marry or to provide for a later spouse
or children of such unions; that it operated as a restriction
of marriage. In support thereof are cited, Elliott on Con-
tracts, secs. 645, 649, 652, 653; C. S., secs. 7826, 7827; 13
C. J. 462; *Lowe v. Doremus,* 84 N. J. L. 658, 87 Atl. 459,
49 L. R. A., N. S., 632; *Bradley v. Bradley,* 19 Ont. Law,
525; *Lower v. Peers,* 6 Eng. Rul. Cas. 347; *Sullivan v. Gar-
esche,* 229 Mo. 496, 129 S. W. 949, 49 L. R. A., N. S., 605;
*Knost v. Knost,* 229 Mo. 170, 129 S. W. 665, 49 L. R. A.,
N. S., 627. Some of these are will cases, but the same prin-
ciple applies in so far as the restraint of marriage is in-
volved.

In this case, we have seen that O. P. Johnson was married
three times. By the second marriage there was born a son,
who lived for some years. If the agreement at bar was
valid, it was enforceable against this son, O. P. Johnson, Jr.;
it was enforceable against the second wife; it would have
been enforceable against any other children born of any of
the three marriages. The mere statement of such a con-
sequence ought to be sufficient to refute the stand taken by
respondent. The words of the court in the case of *Lee v.
Bermingham,* 199 Ill. App. 497, cited by respondent, are
here apropos: "Can it therefore be said that if before the
death of Belle Bermingham a child had been born to her
and her husband, this agreement would have deprived such
child of any share in its parents' estates? Such a condition
would result if the decree of the chancellor can be main-

tained in its entirety. It is self-evident that such a result would be unconscionable and inequitable.''

It should be remembered that we are discussing the contract not merely as one of adoption, but one providing for sole heirship. We shall not here go into the question as to whether the contract operates as a restraint of marriage, since we are of the opinion that inasmuch as the contract for sole heirship would deprive any children subsequently born of their natural rights of inheritance, and would likewise deprive the parents of their right to dispose of property by gift or devise to subsequently born or adopted children or to a spouse of either on a subsequent marriage, such a type of contract offends against the common instincts of natural loyalty, affection and duty and is therefore contrary to the public good and welfare.

The second important objection urged under this head appeals to us just as strongly. Is the agreement unenforceable because performance would be harsh, offensive and unjust to an innocent third party? The evidence is uncontroverted that at the time of the marriage appellant did not know of the existence of the agreement. There is nothing to show that she was acting on mercenary motives in marrying Johnson and much to indicate that she was a comfort and solace to Johnson during the last ten years of his life. While the findings of the trial court show that at the time of his death, Johnson owned only a few personal effects of the value of $200, the inventory and the appraiser's report in the probate proceedings show that he left $2,000 in cash as community property. Assuming that this $2,000 was all the community property left, shall we send this widow out of court with this inadequate portion and give the rest to respondent? To such a conclusion we cannot subscribe.

The first principle on which our conclusion on this point is based is that specific performance of a contract is not a matter of right, but rests in the sound and reasonable discretion of the court. (*Vincent v. Larson,* 1 Ida. 241; *Gall v. Gall, supra;* 25 R. C. L., p. 214, sec. 16; Pomeroy on Contracts, 2d ed., secs. 35–45.) To enforce the contract to the

extent that the trial court has done in this case would certainly be harsh, oppressive and unjust to the appellant here. We shall content ourselves with a mere reiteration of the fact that appellant married Johnson without knowledge of such agreement and shall not dwell on her marital services during the last years of his life. Some of the cases to which we are about to refer dwell on the validity of such contracts as being in restraint of marriage or as tending to disturb the marriage state, and uniformly such contracts as would deprive the subsequent spouse of her ordinary rights of inheritance as a widow have been declared unenforceable.

We feel that we are in the same position in which the court found itself in *Johnson v. Hubbell*, 10 N. J. Eq. 332, 66 Am. Dec. 773, wherein the court states: "There are difficulties in the way of enforcing the performance of this agreement specifically, which appear to me to be insurmountable. The complainant has a right to the protection of this court, and to its aid in establishing and enforcing his rights. But if that protection and aid cannot be afforded him without invading and disregarding the rights of others, this court may not, in its anxiety and desire to relieve one party, inflict a wrong and injury upon another entirely innocent in the transaction."

In *Owens v. McNally*, 113 Cal. 444, 45 Pac. 710, 33 L. R. A. 369, the court held that the contract for adoption was legal, but refused to enforce the agreement of the foster parent to leave the adopted child all his property because of the wrong it would do the widow, an innocent third party.

In *Gall v. Gall, supra,* affirmed in 138 N. Y. 675, 34 N. E. 515, the court says:

"There is another rule which should be strictly adhered to in this class of cases, and that is that the remedy is a matter of judicial discretion, and that relief should be withheld where a decree for specific performance would work injustice to innocent third persons, or where it would be contrary to public policy. . . . . These considerations would have sufficed to sustain the dismissal of the complaint, but they are reinforced by the fact of the decedent's second

37 Idaho.—25

marriage and the existence of lawful issue. The parties, whatever their original understanding, could never have contemplated a restriction upon decedent's rights to marry or to provide for his children in case such marriage was fruitful. Nor could they have contemplated the taking by the plaintiff of the decedent's entire estate, to the exclusion of any such future wife or child. If such an agreement had been made, it certainly would have been against public policy, and void. Whatever agreement was made was necessarily subject to such possibilities, and was limited by implication accordingly.''

The same equitable doctrine is announced and followed in the following cases: *Russell v. Agar, supra; Sargent v. Corey,* 34 Cal. App. 193, 166 Pac. 1021; *Wood v. Evans,* 113 Ill. 186, 55 Am. Rep. 409; *Mayfield v. Cook,* 201 Ala. 187, 77 So. 713; *Pugh v. Bell,* 21 Cal. App. 530, 132 Pac. 286.

Respondent claims that the enforcement of this agreement is not inequitable or a hardship as to appellant, whose legal rights were fully protected by the judgment, and cites among others the following cases: *Dillon v. Gray,* 87 Kan. 129, 123 Pac. 878; *Healy v. Healy, supra; Van Natta v. Heywood, supra; Winne v. Winne, supra; Middleworth v. Ordway,* 49 Misc. Rep. 74, 98 N. Y. Supp. 10; *Bromeling v. Bromeling, supra; Lee v. Bermingham, supra; Roberts v. Roberts,* 223 Fed. 775, 138 C. C. A. 102; *Lynn v. Hockaday,* 162 Mo. 111, 85 Am. St. 480, 61 S. W. 885; *Healy v. Simpson,* 113 Mo. 340, 20 S. W. 881; *Quinn v. Quinn, supra.*

An examination of these cases discloses that in none of them were involved the rights of a widow situated as is the appellant here. In *Dillon v. Gray, supra,* the property sought to be impressed with the resulting trust had all been willed to the testator's sons and the widow claimed no interest therein. In the case of *Winne v. Winne,* the court says in referring to *Gall v. Gall, supra:* "After the agreement in that case was made, the promisor had married again and had issue; it was held the action could not be maintained, because of the second marriage, which was fatal to its

enforcement, since it resulted in taking from a father his entire estate to the exclusion of his future wife and children, and, therefore, was inequitable, and against public policy.''

We conclude, therefore, that the contract to make respondent the sole heir of the Johnsons cannot be enforced because its enforcement would be harsh, offensive and unjust to appellant, who married him without any knowledge of the agreement.

This leads us to a more difficult question, which has not been directly discussed in the briefs or argument of either party. Can respondent recover in this suit under the adoption agreement a child's share of the estate? Relying on the decision of the trial court, respondent claims the full measure of the contract and all the property of Johnson and his first wife, except what may be community property of the last marriage, and, admittedly, this is very little. Appellant contends that if respondent recovers anything, she must recover upon a ''Shylock'' contract which gives her either nothing at all or every dollar that Johnson had at the time of his death, including what he had previously given his wife, the appellant, for her maintenance and support as a reward for her kind and affectionate treatment of him during the later years of his life.

Though we have found that the original contract of 1868 was void and unenforceable, we are not precluded under the pleadings and the facts from finding, as the trial court has found, that in 1874, when Alexander threatened to take his child (respondent), the Johnsons renewed and reaffirmed the said promise and agreement theretofore made (in 1868) and pursuant to said agreement procured the enactment of the legislative act of 1875, hereinbefore mentioned. Even though the original agreement and the renewal agreement of 1874 were invalid when made, the latter became a binding contract on the adoption of the legislative act which is really a part of the agreement. The legislative act itself is not the complete contract of the parties but is the expression of the final assent of the parties to the proposals and agreements made in 1874 which are as much a part of the in-

tegral agreement as is the act. The legislative act itself removed the agreement from the common-law inhibition against adoption contracts. It was then that the agreement became consummated and it cannot be, and is not, seriously contended that there was no legal adoption by said act. It is true that the act provides that written acceptance thereof shall be filed by the Johnsons, and that the required acceptance thereof was not found, but the secondary ·evidence as well as the conduct and statements of the persons is amply sufficient to show that the act was accepted. Even without this secondary proof, it would be presumed from the subsequent acts of the parties that the legislative act was accepted. (*Sayles v. Christie,* 187 Ill. 420, 58 N. E. 480; *Pace v. Klink,* 51 Ga. 220.)

But conceding a legal adoption, appellant contends that respondent acquired no rights thereby superior to those of a natural child, and that as Johnson could disinherit a natural child, so too could he disinherit respondent herein or leave her "$50 and no more," and that he was more than justified in so treating her by reason of her conduct and the grief it caused him. If we hold that the contract is one for adoption and an agreement that respondent will have a share of the estate of the Johnsons equivalent to that of a child, it will substantially reduce the amounts which appellant acquired by the gifts and conveyances made to her in 1914 by her husband. It would not, however, take away from her all of this property as the trial court's decree does. We consider the construction which appellant attempts to place on the contract as consummated by the legislative act of 1875 to be too narrow and inequitable under the facts in this case. This whole record bristles with evidence that it was the intention of the Johnsons to leave her their property on their death, and not until the estrangement in 1900, after the death of Rosanna Johnson, does a contrary intention appear on the part of Johnson. It contravenes no principle of public policy and invokes no unjust, harsh or inequitable rule against the appellant to so construe the contract as to give respondent a child's share in the estate of both the

Johnsons.  Conceding that a parent may disinherit a child, we do not think he is at liberty to disinherit a child under an express contract of adoption wherein he agrees to make her his lawful and legitimate heir.   That provision of the legislative act reciting, ". . . . is hereby made the lawful and legitimate heir of said Orville P. and Rosanna C. Johnson, the same as if she were their natural child, and shall be treated as and have the same rights as an heir as if she were their natural child," must be construed to refer to the amount of the estate which she would receive and that the share was to be measured in comparison with the share that a natural child would receive thus giving effect to the agreement, and protecting those to whom the Johnsons might sustain legal obligations thereafter.

This is the exact construction placed on similar language in a contract considered in *Gates v. Gates,* 34 App. Div. 608, 54 N. Y. Supp. 454.

We do not wish to be understood as saying that by a mere contract of adoption or an adoption under the statutes the adopting parent is thereby precluded from disinheriting an adopted child, or that the adoption places such child in a more favorable position than that of a natural child.   But where it clearly appears, as it does here, that the contract was not only for adoption but to leave the child the property of the adopting parent and to make her his heir, recognition should be given to the rights and obligations created by the contract in addition to those that would have been created by a simple contract of adoption, when such recognition does not offend against the rules preventing enforcement because of public policy, harshness or injustice to third persons.

As we have seen, there was no attempt on the part of Rosanna Johnson to disinherit respondent and there can be no question as to respondent's right to take a child's share of her separate estate.

Supporting the conclusion we have reached are the following cases: *Rogers v. Schlotterback,* 167 Cal. 35, 138 Pac. 728; *Lee v. Bermingham, supra; Wold v. Wold,* 138 Minn.

409, 165 N. W. 229; *Quinn v. Quinn, supra; Winne v. Winne, supra; Lynn v. Hockaday, supra.*

Appellant contends that this suit is barred by the laches of respondent, and in support thereof our attention is called to the fact that in 1902, O. P. Johnson by the probate proceedings had some of the property declared to be his own as community property; that in 1904 and again in 1905 he conveyed the Home ranch to his second wife and to his son, which deeds were recorded and title thereto stood in the names of the grantees until 1913, when in a suit brought by Johnson the title to this property was quieted in Johnson. This suit was begun in October, 1917. Its principal purpose is to set aside the deeds and assignments made to appellant in May, 1914. There is no showing that appellant has been prejudiced by any delay in bringing the action. Though it may be that respondent might have then proceeded, the authorities generally hold on similar contracts that the statute of limitations does not begin to run until the death of the adopting parent and we may consider the period of limitations in determining the question of laches. We are of the opinion that respondent is not barred by laches. (*Rogers v. Schlotterback, supra; Steinberger v. Young, supra; Evans v. Moore,* 247 Ill. 60, 139 Am. St. 302, 93 N. E. 118; *Wold v. Wold, supra.*)

Under the conclusions we have reached, it was error on the part of the trial court to enter a money judgment for the total proceeds of the Home and Riley ranches, which were sold to innocent purchasers after Johnson's death.

The judgment in this case was entered on May 12, 1919. Appellant perfected her appeal therefrom on June 5, 1919. On June 14, 1919, the trial court filed an order appointing a receiver to carry into effect the judgment rendered and to take possession of all the property real and personal which had been decreed to respondent and to administer the same under order of the court. The order further directed appellant herein to deliver all of said property to the receiver and render an account thereof within thirty days, and the cause was referred to the receiver to examine the account, to take

testimony if necessary, and to determine and report as to what was the community property and what the separate property of O. P. Johnson.

In July, 1919, this court quashed an alternative writ of prohibition granted against the district court to restrain the court from further proceeding under said order. As no opinion was filed by this court on quashing the writ, and the questions there considered are raised on this appeal, it seems necessary briefly to discuss the question in disposing of the appeal from the order.

Appellant contends that on perfecting her appeal, the trial court was thereupon divested of jurisdiction of the cause and cites in support thereof *Havemeyer v. Superior Court*, 84 Cal. 327, 18 Am. St. 192, 24 Pac. 121, 10 L. R. A. 627; *White v. White*, 130 Cal. 597, 80 Am. St. 150, 62 Pac. 1062; High on Receivers, 4th ed., secs. 403, 404; C. S., sec. 7162. We think that the point may be disposed of by considering merely our own statutes. C. S., sec. 7162, provides that "in cases not provided for in sections . . . . 7157 . . . . the perfecting of an appeal . . . . stays proceedings in the court below, upon the judgment or order appealed from." C. S., sec. 7157, provides: "If the judgment or order appealed from direct the execution of a conveyance or other instrument, the execution of the judgment or order cannot be stayed by the appeal until the instrument is executed and deposited with the clerk with whom the judgment or order is entered, to abide the judgment of the appellate court."

The decree in this case requires the appellant "to forthwith make, execute and deliver to plaintiff, good and sufficient warranty deeds of conveyance, conveying to plaintiff the legal title to the following real property," and then follows a long series of descriptions of real estate. Such conveyances were never executed by the appellant. She gave no *supersedeas* bond. This disposes of appellant's contention when we consider in addition thereto the provisions of secs. 6817 and 6871 of the Compiled Statutes.

C. S., sec. 6817, provides:

"A receiver may be appointed by the court in which an action is pending or has passed to judgment or by the judgment thereof . . . .

"3. After judgment to carry the judgment into effect.

"4. After judgment to dispose of the property according to the judgment, or to preserve it during the pendency of an appeal, or in proceedings in aid of execution, when an execution has been returned unsatisfied, or when the judgment debtor refuses to apply his property in satisfaction of the judgment. . . . . "

C. S., sec. 6871, provides for the appointment of a referee and its provisions need not be quoted at length. There was need for a referee in this case and, as we understand it, the only point made on the appeal from his appointment is that the court was divested of jurisdiction on the perfecting of the appeal, a matter we have already considered. The order appointing the receiver and referee was proper.

It is the conclusion of the court, therefore, that the order appointing the receiver and referee should be affirmed and that he should proceed under his order of appointment to ascertain and report as to the separate property of O. P. Johnson and Rosanna Johnson and the community property of said Johnson and the appellant herein, in accordance with the views herein expressed.

As practically all of the property of Johnson was conveyed and assigned to appellant in May, 1914, it will be the duty of the trial court to determine, where it has not already so determined, what portion of this property was the separate property of Johnson and not community property of Johnson and this appellant. Since respondent is not directly attacking the validity of the probate proceedings by which O. P. Johnson acquired the separate property of Rosanna Johnson, this property may be considered as the separate property of O. P. Johnson in determining respondent's rights thereto, and respondent will be entitled to a child's share of Johnson's separate property at the time of his death as if he had died intestate under the statutes then in force, such property to include the property conveyed to appellant

in May, 1914, and the proceeds thereof. The community property and that portion of the separate property remaining after deducting respondent's share should be adjudged to belong to appellant, subject to the legacy of $50, provided for respondent in Johnson's will.

McCarthy, Dunn, William A. Lee and Wm. E. Lee, JJ., concur.

PER CURIAM.—The foregoing is hereby approved as the opinion of the court, and the judgment of the lower court is modified in accordance with the views expressed. No costs allowed.

Petition for rehearing denied.